1                   IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF DELAWARE

3

4    GALDERMA LABORATORIES L.P.,      )
     GALDERMA, S.A. and NESTLE SKIN   )
5    HEALTH S.A.,                     )
                                      )
6                  Plaintiffs,        )
                                      ) C.A. No. 17-1783-RGA
7    v.                               )
                                      )
8    TEVA PHARMACEUTICALS USA, INC.,  )
                                      )
9                  Defendant.         )

10
                                      J. Caleb Boggs Courthouse
11                                    844 North King Street
                                      Wilmington, Delaware
12
                                      Thursday, October 31, 2019
13                                    2:30 p.m.
                                      Oral Argument
14

15   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

16   APPEARANCES:

17             MORRIS NICHOLS ARSHT & TUNNELL LLP
               BY:  JACK B. BLUMENFELD, ESQUIRE
18
                        -and-
19
               MUNCK WILSON MANDALA, LLP
20             BY:  MICHAEL C. WILSON, ESQUIRE
               BY:  JAMIL N. ALIBHAI, ESQUIRE
21             BY:  KELLY CHEN, ESQUIRE

22                                    For the Plaintiffs

23

24

25

1    APPEARANCES CONTINUED:

2             SHAW KELLER LLP
              BY:  KAREN E. KELLER, ESQUIRE

3                      -and-

4             KIRKLAND & ELLIS, LLP

5             BY:  LEORA BEN-AMI, ESQUIRE
              BY:  JUSTIN BOVA, ESQUIRE

6             BY:  THOMAS F. FLEMING, ESQUIRE
              BY:  NOAH FRANK, ESQUIRE

7             BY:  ASHLEY ROSS, ESQUIRE

8                                 For the Defendant

9                  ***  PROCEEDINGS  ***

10

11            DEPUTY CLERK:  All rise.

12            THE COURT:  All right.  Good afternoon,

13   everyone.  Please be seated.  This is the time set for the

14   motion for injunction pending appeal in Galderma versus

15   Teva, Civil Action Number 17-1783.

16            Mr. Blumenfeld, who have you got with you here?

17            MR. BLUMENFELD:  Thank you, Your Honor.  Jack

18   Blumenfeld from Morris Nichols for the plaintiffs, and with

19   me today are Mike Wilson, Jamil Alibhai, and Kelly Chen from

20   the Munck Wilson firm.  And in the first row in the back,

21   Steve Midgley from Galderma.

22            THE COURT:  All right.  Thank you, Mr. Blumenfeld.

23            Ms. Keller.

24            MS. KELLER:  Good afternoon, Your Honor.  Karen

25   Keller from Shaw Keller on behalf of the defendants.  Here

1     with me today is Leora Ben-Ami, Tom Fleming, Ashley Ross,

2     Noah Frank, and Justin Bova.  And in the back, we have Rivka

3     Jungreis and Colman Ragan from Teva.

4                    THE COURT:  All right.  Well, good afternoon to

5     all of you.

6                    So Mr. Wilson, I guess this is your motion.

7                    MR. WILSON:  Yes, Your Honor, at least

8     partially.  If I may, I am going to be handling the issues

9     relating to the likelihood of success that address the

10    Court's opinion, and then Mr. Alibhai is prepared to address

11    the issues of irreparable harm.  He put together the

12    evidence and is prepared to argue those issues.

13                   THE COURT:  Okay.

14                   MR. WILSON:  Your Honor, the question being

15    presented is whether or not Teva should be allowed to

16    continue to sell its generic version of Soolantra which is

17    going to indisputably destroy the market for Soolantra over

18    the next six-months.  Even though there's a substantial

19    question on appeal relating to the Court's opinion, and even

20    if the Court's opinion is reversed, that will never repair

21    the damage to Galderma because of an agreement with the

22    second filer that will allow that second filer to remain on

23    the market if the Court does not issue an injunction.

24                   THE COURT:  So there seemed to be some -- and I

25    appreciate that you all have done this under somewhat of a

1    time pressure.  I wasn't real clear, and I guess I'll start

2    off by saying, I did read the briefs, and I did reread my

3    opinion from Docket Item 257, and I read Mr. Hausman's

4    opening declaration and his reply declaration.  I've read

5    Mr. Gambino's opening declaration and his reply declaration.

6            I've read Mr. Bart's declaration.  I've read

7    Mr. Hofmann's declaration.  And I read the declaration of

8    Mr. Cassidy submitted in connection with the reply.  But

9    maybe because I read all that stuff, I wasn't necessarily

10   clear about all of it.

11           In terms of the generic, besides for Teva, we

12   have the authorized generic which I guess is Plasco or

13   Prasco, something like that, and we have the Perrigo

14   generic.  And so the Plasco or Prasco, whatever they are,

15   they either have been authorized, or they haven't themselves

16   launched.

17           MR. WILSON:  They've been authorized and have

18   launched an authorized generic of Galderma.  That's correct,

19   Your Honor.

20           THE COURT:  Okay.  And so Perrigo's position is

21   that they are at the present time blocked by Teva for

22   180 days since Teva launched; right?

23           MR. WILSON:  They are blocked both by the

24   statutory exclusivity as well as the agreement that they

25   signed with Galderma.  That's correct.

```
1              THE COURT:  Okay.  And so the launch of your
2    authorized generic, what effect does that have on Perrigo's
3    ability to launch in the future?
4              MR. WILSON:  So the launch of an authorized
5    generic like Teva's launch acts as a potential license to
6    Perrigo.  They have to wait 180 days based on the statutory
7    exclusivity.  But as what I first mentioned when I raised
8    the question is that if the Court issues an injunction, if
9    there's an injunction in the next 90 days, there's a reset
10   essentially for Perrigo's ability to launch.
11             THE COURT:  And is the reset then just back to
12   whatever the contract provided for them, or what is that
13   reset?
14             MR. WILSON:  Yes, Your Honor.  The reset would
15   be to the next event that would trigger a license.  For
16   example, if Teva were to win on appeal, and then launch
17   again, if the Court granted an injunction and removed the
18   injunction after the appeal, they would get to launch
19   181 days after Teva's next launch.
20             THE COURT:  And so the reason for the 90-day
21   thing is essentially that's sort of a matter of practicality
22   which is presumably for Perrigo to launch, they have to ramp
23   up, and get supply, and do stuff.  So after 90 days, I
24   guess, maybe as part of the whatever agreement you made with
25   them, but that that's just giving them a reasonable amount
```

1    of time to respond.  That's essentially why the 90 days is

2    there?

3                MR. WILSON:  I think it's more the situation

4    where there's a launch at risk.  It's a standard, as far as

5    I understand, a fairly standard agreement.  But it's

6    essentially to address the situation of when there is a

7    launch at risk or some other unauthorized launch that

8    Galderma has an opportunity to get a Court to intervene like

9    through this motion, and therefore, block Perrigo's

10   otherwise contractual right to launch.

11               THE COURT:  Okay.  All right.

12               And so basically I hate to appear to be too

13   dense here, but what you're telling me is 90 days after your

14   authorized generic is launched, if it's still out there,

15   then Perrigo's going to be able to launch no matter what

16   happens with Teva; right?

17               MR. ALIBHAI:  That's right.  After 180 days

18   after Teva's launch, they would be permanently on the market

19   which is why the irreparable harm in this particular case is

20   different than it may be in other cases.  And that is, even

21   if the Court agrees that there's potential for reversal of

22   the Court's opinion, and even if Galderma succeeds in

23   reversing, that reversal will not remove the generic from

24   the market.  This is a permanent presence of a generic on

25   the market if an injunction is not entered within 90 days of

1   Teva's launch at risk.

2            THE COURT:  Okay.  Well, thank you.  That's

3   helpful.

4            So you want to tell me why there's a -- you have

5   made a strong showing that --

6            MR. WILSON:  Likelihood of success on appeal?

7            THE COURT:  Right.

8            MR. WILSON:  Yes, Your Honor.  There's two broad

9   issues.  As I've already mentioned, one is likelihood of

10  success.  The other is irreparable harm.  The Court's

11  already asked a few questions on harm, but --

12           THE COURT:  No.  No.  No, because I think I

13  understood a lot of what I read, but I may not have, but at

14  least there was one area where I knew that I hadn't actually

15  understood what I read.  So as you were up -- but yeah,

16  let's get back to likelihood of success on the merits.

17           MR. WILSON:  Yes, Your Honor.  We believe

18  there's two potential errors in the Court's memorandum

19  opinion that are going to be of interest to the Federal

20  Circuit.  The first issue is that we believe the way the

21  Court ruled on inherent disclosure of the efficacies is that

22  that was based on one possible use of McDaniel's method as

23  opposed to what's necessarily present which is the legal

24  standard for something being inherently disclosed by a

25  reference, in this case, McDaniel.

1                    THE COURT:  All right.

2                    MR. WILSON:  So that's one problem.  And the

3       other problem is the way that the Court used the concept of

4       enablement is that the Court used enablement to supplement

5       or add to what McDaniel disclosed, and effectively ruled as

6       if the compositions that were disclosed 12 years later in

7       Manetta was part of McDaniel, and therefore, that the

8       efficacies were inherent in McDaniel.  So those are the two

9       issues that we believe are contrary to the law of the

10      Federal Circuit and that we believe raises a substantial

11      question on appeal.

12                    I'd like to start, because the parties could not

13      agree with respect to the legal standard --

14                    THE COURT:  Oh, I think I got that.  Don't you

15      think the legal standard is essentially -- I know this is

16      your position, a strong showing that it's likely to succeed

17      on the merits in the appeal.

18                    MR. WILSON:  We do agree that that's the

19      standard except I would say that the Federal Circuit

20      recognizes the sliding scale.  In other words, where there's

21      a clear showing of irreparable harm, the standard for the

22      likelihood of success is lowered to a fair --

23                    THE COURT:  Was that disputed in your briefing?

24                    MR. WILSON:  Yes.  Yes, it was disputed.  Teva

25      took the position that you'd have to show a strong

1    likelihood of success, not just on the appeal, but on all

2    the merits.

3              THE COURT:  No, but that's a different --

4              MR. WILSON:  Different issue.

5              THE COURT:  Yeah.  Yeah.  So that's what I was

6    addressing when I -- yeah.  I don't agree with Teva on that,

7    so you don't have to really spend a lot of time on that.

8              MR. WILSON:  With respect to how strong of a

9    showing, I think the best case is Standard Havens.  We've

10   cited that in the reply brief at Page 2, and that discusses

11   this sliding scale, and you know, introduces the idea that

12   just a fair chance better than negligible chance can be

13   sufficient if there's a strong showing of irreparable harm.

14   And so I think that's a good case to give the Court guidance

15   on how strong of a showing is needed on the question for

16   appeal.

17             So unless the Court has other questions, there's

18   a debate about which circuit controls, and we've cited

19   revision history out of the Federal Circuit that says

20   Federal Circuit law controls, not Third Circuit law.  And so

21   that's also in our reply brief on Page 1.  That's binding on

22   the Court.  The Federal Circuit says that Federal Circuit

23   law applies to the burden on likelihood of success, so we

24   think those are the two cases that guide the Court in terms

25   of the standard.

```
 1                    THE COURT:  Okay.

 2                    MR. WILSON:  So Your Honor, I'll turn to the

 3   Court's opinion and just kind of walk through my thoughts on

 4   what we believe the Court did wrong in terms of finding

 5   inherency in McDaniel.

 6                    And Ms. Chen, if I can bring up the -- I'm

 7   sorry.  Yes, sorry, McDaniel.

 8                    So we're looking at the memorandum opinion, Your

 9   Honor, Document 257.

10                    THE COURT:  Yeah, I've got it.

11                    MR. WILSON:  And this is Page 2.  And I think

12   the Court's claim construction is irrelevant.  This was the

13   Court's -- there was debate at closing argument about

14   whether or not the efficacy elements were limiting, whether

15   they should be considered part of the claims for purposes of

16   validity, and the Court made that decision in the memorandum

17   of opinion here finding that all of the asserted claims

18   require these method steps of topically administering, et

19   cetera, and then separately stated that some of the claims

20   require the efficacy.  It made that statement two or three

21   times in the memorandum, therefore, adopting Galderma's

22   position that the elements about superiority metronidazole

23   within two weeks --

24                    THE COURT:  So what you're saying is I agreed

25   with you?
```

1                MR. WILSON:  Yes, Your Honor.

2                THE COURT:  Okay.

3                MR. WILSON:  This opinion makes clear these are

4    limited, and part of the claim for purposes of evaluating

5    validity.  I think the next relevant part of the opinion is

6    to look at the findings of fact, and if we can go to Page 6

7    and look at the Court's findings of fact nine and ten which

8    is on the screen.

9                This is the Court's findings, factual findings

10   with respect to what McDaniel discloses as to the claim

11   elements, and the Court made two findings.  One was what was

12   explicitly disclosed which was the method steps.  Galderma

13   disagreed with that and still disagrees with whether all

14   those method steps are disclosed, including using one

15   percent once daily and treatment of PPR and lesions.  That's

16   not relevant to the motion today, but the Court did find --

17   made a factual finding that all of those were explicitly

18   disclosed in McDaniel.

19               And then I think the important one was to what

20   we're arguing today in terms of likelihood of success is

21   that McDaniel did not explicitly disclose the efficacies,

22   and that they were inherently disclosed in the treatment

23   method that was disclosed in McDaniel.

24               So when you have -- as the Court's aware, the

25   parties have briefed it, what's required in order to show

1   that an element that's not expressly disclosed like the

2   efficacy elements and in terms of the Court's findings

3   what's required in order for that to be inherent.  And I

4   think there are -- as I went back through the briefing, I

5   found three cases that I believe were illustrative of what

6   is required in order to make a finding of necessarily

7   present or inherency in this type of situation.  They're

8   cited in the papers, but I'd like to briefly discuss them.

9            The first one is a case called Purdue Pharma.

10  This is cited in the reply brief.  It's 811 F. 3d 1345.

11  It's in their reply brief at Pages 5 and 6.

12           THE COURT:  And you're talking about the reply

13  brief on this motion or the reply brief back at the briefing

14  on the underlying case?

15           MR. WILSON:  Yes, Your Honor.  This was cited in

16  the reply brief on Tuesday --

17           THE COURT:  Okay.

18           MR. WILSON:  -- relating to this motion.  And so

19  Purdue Pharma was a case relating to a patent that covered a

20  tablet, and the key element, the element that was discussed

21  as being inherent was an element that said -- it talked

22  about a certain type of dosage form tablet, and there was a

23  wherein clause that's similar to the wherein clauses for our

24  case.  Wherein the dosage form had a breaking strength of at

25  least 500N.

1         So we have an analogous clause where it's a

2    performance wherein clause.  Similar to wherein the method

3    that's taught in our patents achieves these efficacies.  And

4    so if we can pull up -- this was the evidence that was

5    introduced in that case relating to inherency.

6         So again, the element was:  Did the dosage form

7    have a breaking strength of at least 500N?  And the

8    situation in this case was there was a prior art patent that

9    discussed how to make tablets, but did not disclose

10   expressly that that method would achieve this breaking

11   strength.

12        And so the defendant in that case actually had

13   an expert perform testing, and it's described here in this

14   footnote where they created thousands of tablets using the

15   method of the prior art.  And he actually testified at trial

16   that to a -- every single tablet that was created according

17   to the method that was in the prior art met the 500N

18   element.

19        THE COURT:  Isn't that essentially what your

20   claims, which are results of clinical trials, and are

21   percentages, and estimates, and things, isn't that the same

22   thing?

23        MR. WILSON:  Yes, it is similar in the sense of

24   there is a wherein clause in the Jacovella patents, the

25   asserted patents that require that the method achieve

1    certain efficacies.  Absolutely.

2           But in this case, the defendant presented

3    evidence that if you followed the equivalent of saying if I

4    follow McDaniel thousands of times, I am 100 percent of the

5    time going to achieve this wherein clause of this breaking

6    strength.  And that's what the Court relied upon that said

7    if I go back and look at the prior art patent, I've

8    performed testing, and I know through this expert's

9    testimony that every time I followed that prior art patent,

10   I'm going to achieve this wherein clause in a new patent.

11          And based on that evidence, the Court said that

12   the evidence was without exception, every time they

13   performed the prior art method, they achieved the allegedly

14   inherent element of the patent.  And the Court found

15   inherency.  But that gives you an example of the type of

16   evidence that's necessary in order to say something is

17   necessarily present.

18          THE COURT:  Isn't the clinical trial evidence

19   that you incorporate into your patent, doesn't that prove

20   exactly that?

21          MR. WILSON:  What the clinical trial proves is

22   that the formulation that was tested in the clinical trials

23   achieves these efficacies.  That's what it says.

24          THE COURT:  But it was good enough for the FDA

25   to let you sell it; right?

1           MR. WILSON:  Absolutely.  It's good enough for

2    the FDA to sell it.  What it's not good enough for is to say

3    the method that was disclosed in McDaniel is always going to

4    achieve those efficacies.  That's the question on inherency.

5           The question, as the Court found correctly, by

6    the way, we believe, that none of the efficacies that appear

7    in the Jacovella patents about superiority to metronidazole,

8    statistical superiority in terms of relapse, statistically

9    significant reduction of lesions at two weeks, okay, none of

10   those were expressly disclosed in McDaniel.

11          And so the question for the Court on inherency

12   was:  Can I just take McDaniel, which doesn't disclose any

13   of those efficacies, follow McDaniel, and no matter how --

14   what variations I use in following McDaniel --

15          THE COURT:  Yeah, but see I don't think that's

16   the right question.  It's not every variation is McDaniel.

17   It's the variation of McDaniel as claimed now as in your

18   patent.

19          MR. WILSON:  I disagree.  I don't believe so.

20   That's the thing on inherency.  Inherency requires that what

21   was disclosed in McDaniel inherently achieved the claims.

22   It's not if you practice McDaniel according to the new

23   patents, if you use the composition tested in the new

24   patents, will that achieve the claims.

25          THE COURT:  Well, see, that's where I disagree

1    with you because I think it's if you have a disclosure, a

2    broad disclosure in McDaniel that then you divide it into

3    ten slices, each of those slices which may produce different

4    results.  If you do that slice, it's inherent.

5              MR. WILSON:  Right.  And I believe --

6    respectfully, I believe that's wrong.  I think that is the

7    opposite of necessarily present.  It can -- the case law is

8    clear, it cannot be based on possibilities or probabilities.

9              THE COURT:  No, that's the point is if you pick

10   the ten percent, if you do the slicing, I don't think it's a

11   possibility.  I think you have basically -- you know, you

12   have something that when you take that slice, you will get

13   that result.

14             MR. WILSON:  That is true of any obviousness

15   case where you're going to combine it with a later patent

16   and you say, I have these three elements over here.  I'm

17   going to combine it with another patent.  And when I do

18   that, I have all the elements.  That's a combination.

19             Let me address the Armodafinil -- sorry about

20   the pronunciation -- the next case I was going to discuss

21   because I think it directly answers the questions you're

22   raising, and this was cited.  This is a Judge Sleet case.

23             THE COURT:  Okay.

24             MR. WILSON:  By the way, and if we could start

25   on 465, this is exactly the question you're raising.  It was

1    a method patent.  And what Judge Sleet said is if the prior

2    art here, McDaniel, can be practiced in a way that yields a

3    product lacking in the inherent property, it does not

4    inherently anticipate.

5         And so to go back to your example where there's

6    ten slices, if one slice won't practice the patent, it's not

7    inherent.  It's not necessarily present.  And if we can go

8    to the -- to Page 469, the evidence in this case was

9    interesting.  There was evidence in this case.  I think it's

10   in the footnote 13.  I'm not sure.

11        There was evidence in this case.  There was

12   declarations submitted during prosecution of the patent

13   where there was a --

14             THE COURT:  "In this case," you mean this case?

15             MR. WILSON:  Armodafinil, the case we have on --

16   I'm sorry.

17             THE COURT:  No.  No.

18             MR. WILSON:  Armodafinil, the case we have on

19   the screen here.  It's highlighted at the top of the page.

20   There was evidence that -- so the prior art in this case was

21   preparation one.  Okay.  I don't remember the name of the

22   reference, but they refer to it in the case as preparation

23   one.  So that was the prior art.

24        And the theory by the defendant was every time I

25   follow preparation one, I'm going to inherently achieve

1    what's in the asserted patent.  And there was actually

2    evidence in that case that it didn't submit it during

3    prosecution that there was 34 experiments done following the

4    prior art following preparation one.  And 90 percent of the

5    time, it achieved what was claimed in the new patent.

6              THE COURT:  No.  I understand that's not

7    inherent.

8              MR. WILSON:  Therefore, it's not inherent.  And

9    that's the same situation here.  Here, we have Teva never

10   even tried to say that every time you follow what you found

11   to be expressly disclosed in McDaniel, one percent once

12   daily to treat PPR, the factual findings you made with

13   respect to what was expressly disclosed, there was zero

14   evidence presented by Teva that said inevitably you

15   necessarily will achieve the efficacy claims that you found

16   to be inherent.  Zero evidence of that.

17             In fact, Teva did the exact opposite.  Not only

18   did they not present evidence that that was necessarily

19   present, they actually fought infringement for their

20   FDA-approved drug.  That's one-percent ivermectin used once

21   daily.

22             They put experts on the stand that said not only

23   is it not inherent, we don't think we infringe those

24   efficacy elements.  It can't be necessarily -- they can't,

25   on one hand, say it's necessarily present, it's going to

1     happen a hundred percent of the time, and then turn around

2     and put evidence on, and argue to the Court, We don't even

3     infringe those steps.

4              The only efficacy element that they admitted

5     they infringe was significant reduction.  Every other

6     element, they said they don't achieve.

7              Now, we disagreed with that.  And there was

8     evidence of infringement, we believe strong evidence of

9     infringement of those efficacy elements.  But my point is

10    they didn't try to show necessarily present.  And there's

11    other evidence that we cited.  If you look at footnote 12 in

12    our reply brief, we cited testimony.

13             THE COURT:  Yeah.  You know, it's dangerous to

14    rely on footnotes.

15             MR. WILSON:  It is.  I have a bad habit of using

16    them, but --

17             THE COURT:  Yeah, so I see.

18             MR. WILSON:  In footnote 12, what we cited was

19    testimony from their experts that's in the trial record.

20             THE COURT:  Okay.  It says footnote 12 of the

21    reply brief.  It says Teva brief at 7/8.

22             That's supposed to be helpful to me?

23             MR. WILSON:  Well, let me find it, Your Honor.

24    I apologize.  I thought -- I thought it was footnote 12.

25    Yes.  We cited -- and I apologize for not having the

1    footnote correct.  We cited the evidence -- let me see if

2    it's in the motion.  I apologize, Your Honor.

3              THE COURT:  I mean, but it just goes to show why

4    you don't capitalize your own footnotes.

5              MR. WILSON:  Okay.  I am correct, it's footnote

6    12.  I have the wrong -- wrong document.  It was actually

7    footnote 12 in the opening brief, Your Honor.

8              THE COURT:  Okay.

9              MR. WILSON:  But we cited Dr. Amiji,

10   Dr. Betensky, Dr. Gallo, and we asked these questions for a

11   very specific reason, and that was to disprove anticipation

12   by McDaniel.  And we asked Dr. Gallo:  Is every one percent

13   applied once daily going to achieve these efficacies?  And

14   they said, I don't know.  They declined to predict what

15   would happen when you follow every step of what you found to

16   be expressly disclosed in McDaniel.

17             Dr. Gallo said he didn't know.  Dr. Betensky

18   said she didn't know.  Dr. Amiji said you would have to do

19   testing, and then they contested infringement.

20             So that is the opposite of the evidence that I

21   put up here in this other case that -- where they have an

22   expert testify.  I have done the prior art method, and every

23   single time I do it, I achieve this wherein clause that was

24   in the patent.  And so that's the type of evidence that

25   courts need in order to find something's necessarily

1    present.

2              The last case that I would point the Court to is

3    the Braintree case which is -- it was a solution that had to

4    be hypertonic.  And basically the evidence that came out of

5    trial was that was supposedly the inherent element that was

6    not expressly disclosed in the prior art.  And the evidence

7    that came out is, I don't know, I'd have to test it to know

8    whether it was hypertonic or not.  And the Court said, Look,

9    if you have to test it, and you can't tell me it's there a

10   hundred percent of the time, that's not inherent.

11             So that is, I think, what would have been

12   required.  And the other thing that's important is that

13   McDaniel doesn't disclose a composition.  There's no

14   excipients described by McDaniel that tells you this is the

15   composition you use to treat people with ivermectin.

16             THE COURT:  But the excipients, they're not

17   disclosed.  They're not claimed in your patent, are they?

18             MR. WILSON:  They are not.  They are not

19   claimed.  What's required is use of a one-percent ivermectin

20   composition that achieves these specific efficacies.

21             So the composition is claimed in the sense that

22   you have to use a one-percent ivermectin composition that is

23   going to achieve all of the efficacies that are claimed.

24             THE COURT:  You know, that strikes me as there's

25   something else wrong with that.

1          MR. WILSON:  Well, Your Honor, I would take a

2    look -- we cited a case that Chief Judge Prost discussed, a

3    very similar situation, and that is the *Allergan Sales v.*

4    *Sandoz* case.  It's 935 F. 3d 1370, and that's exactly what

5    she found.  There was a situation there where she concluded

6    that there was no basis for assuming that all formulations

7    of the claim combination behave like the brand drug.  Since

8    other compositions could be present in the composition, such

9    as solvents, buffers, preservatives, that would not achieve

10   the benchmark efficacies that were described in that case.

11          And so, no, there is no composition.  You don't

12   have to use specific excipients.  What you do have to use is

13   one-percent ivermectin composition once daily and achieve

14   these efficacies.  And so, again, that's a type of evidence

15   we've seen, and there's no evidence in the record whatsoever

16   that if you follow McDaniel's method, you're necessarily

17   inevitably going to achieve the efficacies that are claimed

18   in our patents.

19          So turning back to the Court's opinion, if we

20   can go to Page 14, I've already discussed what I think the

21   evidence would need to be in order to find inherent

22   disclosure, but I want to talk about what the Court actually

23   did because here this paragraph that's highlighted at the

24   bottom half of 14, you mentioned that we argued, as I'm

25   arguing today, that in order to meet the burden of

1    anticipation, they have to show that one-percent ivermectin

2    formulation inevitably achieve these efficacies.  I believe

3    that's correct.  I've cited the cases that I believe support

4    that.

5            You said we cited no authority.  Respectfully, I

6    think we did cite that in the briefing.

7            But then what the Court did next I think is

8    what's important because after rejecting that you thought

9    that was what was required to prove inherency, you said to

10   the contrary, it is well established that for a prior art

11   reference to be enabling, it need not enable the claim in

12   its entirety, but only enable a single embodiment.

13           We were arguing about inherency and what they

14   had to show for inherency, and the Court went and applied

15   the standard for enablement in which one adequate example is

16   sufficient.  That is the opposite of inherency.

17           So the problem is, yes, one example in a patent

18   might be sufficient to enable, but that is not sufficient to

19   find something necessarily present or inherent.  And by the

20   way, in the Court's inherency analysis in terms of finding

21   that these efficacies are inherent, the Court didn't cite

22   any evidence.  The Court didn't cite any expert testimony,

23   no witness testimony saying they didn't even try to present

24   an expert that said, This is always going to happen when we

25   follow McDaniel.  You're always going to get these

1    efficacies.  You're inevitably going to get these

2    efficacies.

3              There was no evidence.  That's why the Court

4    didn't cite it.  That's why the Court didn't cite it.

5    Instead, they posited -- Teva posited this enablement theory

6    which is flawed, and the Court adopted it.  That's what

7    happened.

8              They presented this enablement theory.  That's

9    what the Court used.  The Court didn't cite any evidence on

10   inherency supporting the idea that it's necessarily present.

11             I do think that there's a separate issue, as I

12   mentioned earlier, and that is using Manetta and injecting

13   it into McDaniel.  If we go up a little bit on Page 14,

14   please, this is where the Court gets to inherency, the only

15   remaining issue.  And the way the Court phrased it was the

16   only remaining issue is whether McDaniel discloses using the

17   same formulation.

18             Okay.  And then down below, you talk about

19   enablement and the fact that there's a stipulation that

20   Manetta is one of formulation that enables McDaniel.

21   Enablement allows a piece of art to be -- to qualify as

22   anticipatory prior art.  It does not change what McDaniel

23   discloses.

24             And the way the Court wrote the opinion, the

25   Court through enablement made the conclusion that enablement

1     injected the Soolantra formulations into McDaniel, and then

2     said, well, now the efficacy is based on what the Court

3     concluded about the express disclosures, said if you use

4     Soolantra, one percent once daily to treat PPR, you're going

5     to achieve these efficacies.  That's changing the

6     fundamental disclosure of McDaniel.  That is not proper.

7            And so I think both of those -- basing it on

8     possibilities instead of what's necessarily present and then

9     using enablement to basically supplement what McDaniel says,

10    and then find inherency, I think both of those are issues

11    that the Federal Circuit may disagree with.  And again, the

12    Court doesn't have to today decide that it agrees with me on

13    these issues.  What the Court has to decide is there is a

14    fair question, there's enough of a question that the Court

15    should stop the generic activities so that the Federal

16    Circuit can make a decision on whether the Court agrees with

17    Your Honor's opinion.

18            THE COURT:  All right.  Thank you, Mr. Wilson.

19            Why don't I hear from Ms. Ben-Ami about this

20    rather than from Mr. Alibhai about the irreparable harm.

21            MS. BEN-AMI:  We do have some slides, Your

22    Honor.  May I proceed, Your Honor?

23            THE COURT:  Yeah.

24            MS. BEN-AMI:  I believe counsel just told you an

25    incorrect view of the law.  If I have a patent and say in

```
 1    any case, and in that patent, I have three examples, and one

 2    of them meets every element of the claim except it doesn't

 3    say something that's inherent, and let's assume we agree

 4    that that is inherent, the fact that the other two examples

 5    don't meet that is irrelevant.  If you have an example that

 6    meets every element explicitly or inherently --

 7              THE COURT:  I mean, I'm not sure that Mr. Wilson

 8    would actually disagree with what you're saying right now.

 9              MS. BEN-AMI:  I think that is what he said

10    because he's saying you have to say inevitably everything is

11    going to work, no matter what and that --

12              THE COURT:  No.  Well, what I interpreted him to

13    mean is if you say one percent to five percent once or twice

14    daily, I guess what I thought he was saying is that's a

15    range of options, and you would have to work at one percent.

16    It would have to work at five percent.

17              MS. BEN-AMI:  No, Your Honor.  I don't believe

18    that's what Mr. Wilson was saying.

19              Mr. Wilson, were you saying it has to work at

20    five percent?

21              MR. WILSON:  Do you mind if I --

22              MS. BEN-AMI:  Go ahead.

23              MR. WILSON:  -- step up here?  I'm sorry.  I

24    think the issue on whether or not a different one percent

25    composition will work is about the composition.  The
```

1   testimony at trial that we got from Dr. Amiji and

2   Dr. Betensky was the issue of if you change any excipients,

3   they don't know if it's going to work.

4                 MS. BEN-AMI:  That's different.

5                 THE COURT:  Okay.  But that seemed like -- well,

6   so maybe you're right.

7                 Ms. Ben-Ami, in any event, go ahead.

8                 MS. BEN-AMI:  So can we have Slide 24?  This has

9   been rejected by Courts.  If you look at *Schering vs.*

10  *Geneva*, Federal Circuit case, and an anticipatory reference

11  need only enable subject matter that falls within the scope

12  of the claims at issue, nothing more.

13                THE COURT:  And we think in that sentence that

14  enable means disclose?

15                MS. BEN-AMI:  Yes, enable subject matter.  And

16  if we look at Slide 23, going backward, but I'm trying to

17  address, this is a case where Galderma stipulated to

18  something, and they have tried to back pedal from that at

19  trial and now here in court.

20                And this is what was said at a deposition to get

21  me to stop asking questions of Dr. Webster.  They were

22  agreeing that Manetta enables McDaniel in 2012 as to the

23  claims as well as everything that it taught as to the

24  formulation.

25                So now they're saying that when it says you can

1    make a formulation with sufficient penetrating agents that

2    it will work.  That is enabled by Manetta.  Manetta has told

3    you it will work.

4            And so if we look at, say, Slide 21, let's look

5    at claim 1 of McDaniel.  McDaniel says a method of treating

6    rosacea orally administering or topically, et cetera, et

7    cetera in a dose sufficient to fill and eliminate the

8    Demodex mites.  Resulting, they're saying there's a result.

9    Resulting in cessation of the manifestations of the allergic

10   and vasomotor responses to the organism that causes the

11   symptoms and signs of rosacea.  It is a claim to a method of

12   treatment getting a result.  And that is explicit.

13           And in the specification, and you cited this

14   several times, Your Honor, this part of the specification on

15   the right where it says the clinical signs of these bad

16   things happening from the Demodex are papules and pustules.

17   So where it says the clinical cessation of the manifestation

18   that caused these clinical signs, it's saying method of

19   treatment, topical, resulting in cessation of what is

20   causing these clinical signs ending the papules and

21   pustules.

22           That is enabled.  They have admitted it works.

23   They've admitted, and now they come back and say, but not

24   every -- you could make a formulation that doesn't work.

25           But you take what is explicit in the patent and

1   now you say, is something missing?  Here, what they were

2   saying was missing was a specific formulation.  And then

3   during the deposition, they say, No, we're not going to

4   argue that.  We're going to argue that -- we're going to

5   admit that the formulation element in the claims is enabled.

6   And if that formulation element in the claim is enabled,

7   then everything that is taught in that claim works.  And

8   that claim says you're going to reduce papules and pustules.

9              There is a resulting feature in that claim.  So

10  what we have here is a situation where -- and we can go

11  through the other claims, and I'm not quite sure what claim

12  we're even arguing about because, as far as I can tell, the

13  only claim where there's an admission of infringement, I'm

14  sure of this, is claim 6 of the '118 patent.  And claim 6 of

15  the '118 patent, the only thing it says is broad, any

16  topical, one percent, about one percent.  So it's even

17  broader than that, and it says resulting in a significant

18  reduction of lesions which could be one lesion out of a

19  hundred, and it could take two years.  It doesn't matter.

20             This claim says the same thing.  It says the

21  same thing.  Originally, they said, Oh, but you don't have a

22  formulation that specifically says that it will do that.

23  Then they said, No, we agree the formulation is enabled by

24  Manetta.

25             So when we look at McDaniel, claim 6 is gone.

1    Claim 6 is gone because claim 1 includes the same things.

2    And then when you go down to claim 5, it tells you it can be

3    a carrier lotion, a cream, or a gel just like the '118

4    patent tells you that.  And then it says at least once or

5    twice daily for a period of about two weeks.  It tells you

6    that.

7              So all the elements that we're talking about,

8    and in the specification it tells you it's going to work

9    better than metronidazole.  I don't know why we have to talk

10   about all of these elements.  But certainly, certainly what

11   was the purpose of making this stipulation?  On Page 23,

12   please.

13             THE COURT:  Well, I think you said the purpose

14   is to stop you from asking Dr. Wilson questions.

15             MS. BEN-AMI:  Dr. Webster.

16             THE COURT:  Webster.

17             MS. BEN-AMI:  Yes, but I said I want to make

18   sure we have a real stipulation.  You're agreeing that

19   Manetta enables in 2012, enables the claims.  And if the

20   claims are enabled, then that means when you read that claim

21   and it says it's a method of treating, it's going to get

22   these results.  That's all you need.

23             THE COURT:  But the results that are disclosed

24   in McDaniel are not as precise or specific as the results

25   that are in the Jacovella patent; right?

1           MS. BEN-AMI:  If we look at Slide 21 again, the

2      only thing in this claim is that it says obtain a

3      significant reduction of inflammatory lesion count.

4           THE COURT:  Well, you're talking about claim 6,

5      but there were other claims, too; right?

6           MS. BEN-AMI:  There's no other claim where

7      there's a finding where there's infringement.

8           THE COURT:  No.  No.  I understand your point,

9      but after all, I invalidate all the claims, not just claim

10     6.  Are you saying, yeah, you can't really speak as to

11     whether the rest of that invalidation is any good?

12          MS. BEN-AMI:  Oh, no, I can.  I just didn't

13     necessarily make slides for everything else because this is

14     a motion on whether it is providing an injunction.  And for

15     an injunction, you need infringement and validity.  Right.

16     You can't have -- if you have validity and no infringement,

17     you can't enjoin.

18          So in the patent in the specification, and I

19     don't know if we still have that slide, it says that it is

20     better than any prior treatment.  And then when it says it's

21     better than any prior treatment in the example with the

22     three patients, Slide 20, you have Slide 20 where it says

23     that the patients were given metronidazole topical which

24     failed, and now they succeeded with the oral ivermectin.

25          And you'll recall the next paragraph, it says,

```
 1    and now topical is included as well, and you just have to
 2    use enough permeating agents for it to work.
 3               THE COURT:  So Mr. Wilson said a bunch of
 4    things, some of which I think I've heard before.  I saw in
 5    the briefing, some of which I was not so sure about.  So one
 6    of the things that he said now was something like the
 7    formulation is limited by the results of your claim.
 8               Do you have any comment on that?  First off, do
 9    you understand my question?
10               MS. BEN-AMI:  I think what he's saying is, and
11    this was our written description argument which is an
12    alternative ground, right.  What he's saying is -- let me go
13    to Slide 22.  Maybe that will help.
14               I want to just go back a little bit.  There's
15    only one formulation that was ever tested, one clinical
16    trial formulation.  The patent here does not teach which
17    formulation it was, and I'm talking about the
18    patents-in-suit.  Rather, they said there are four examples
19    of Manetta, and they all work.
20               So what did we just learn from that, that
21    without testing they can tell you that three examples in
22    Manetta that were never tested will work as well.  So we
23    have that -- like the tablet case, you know, with here,
24    they're saying we know that this is going to work, and there
25    are four examples.
```

1          Now, then they said, but you know, we can't tell

2     you that you need to use this excipient to go ahead and make

3     it work, or that excipient to make it work, or you know,

4     boil it at this temperature, or that temperature, whatever

5     it is.  But that doesn't matter because the claim only

6     claims the things that work.

7          THE COURT:  Yes, that's what I think he just

8     said.

9          MS. BEN-AMI:  Well, you go back to McDaniel, the

10    same is true.  The claim only claims the things that work.

11    The claim says I'm claiming that the thing, the method

12    wherein you get the results.  I'm claiming a method where

13    you can use it once daily.  I'm claiming the method where

14    it's better than metronidazole.  I'm claiming -- so it's the

15    same.

16          If we look at this, if we look at the difference

17    between the two things, they claim broadly -- remember, they

18    have claims to a Soolantra formulation.  We don't infringe

19    those.  So the only way they can attack us, they would --

20    they would argue that we infringe Manetta, which they don't.

21          So here they've gone ahead, and they've

22    expanded, and they say, It doesn't matter that we don't

23    teach you all these different ways to do it because all we

24    do is you test it, and if it works, then it's in our

25    invention.  So both broad disclosures, both claim results,

1    both disclose results that this is what you want to get, and

2    it has to be the same for both patents.

3         The reality is that the McDaniel patent teaches

4    that it's better than metronidazole.  If you look at Slide

5    20 in these examples of these patients, it says they failed

6    on metronidazole, then they succeeded.

7         Dr. Gallo testified that these were three for

8    three, that shows that they're statistically significant.

9    Remember that it doesn't mean it's a big difference.  We

10   have to remember what significant in these claims mean.

11   Significant in these claims means it's not by chance alone.

12   That's all it means.  That's all it means.  It doesn't mean

13   it's ten times better, or a hundred times better, or one

14   percent better, or two percent better.  It just means that

15   it works.

16        THE COURT:  So let me ask you a question,

17   Ms. Ben-Ami, because I have to say that you seem to be all

18   over the map without actually addressing what Mr. Wilson

19   said.

20        Did I get something wrong in the opinion?

21        MS. BEN-AMI:  No.  No.  And I think if Your

22   Honor looks at the Ben Venue, the BMS v. Ben Venue case, the

23   second part of the anticipatory, there's two groups of

24   claims that anticipated.  And you go through that, you're

25   right on point.  If you look at Schering, it tells you if

1    you have one example that's enabled, it's right on point.

2    If you look at Perricone, Perricone --

3            THE COURT:  Well, I thought Perricone was the

4    case.

5            MS. BEN-AMI:  Perricone is the case.  Perricone

6    says if you're doing the same exact method, then that's it.

7    And so what they're trying to say is if a patent tells you

8    that you can make formulations that work, and then -- but

9    there might be a formulation that doesn't work, the part

10   that says you can make formulations, that work is

11   irrelevant, and that's not the law.  That's not the law at

12   all.

13           If I go back to this, let's imagine there was an

14   example, one example in writing.  Right.  As in McDaniel, it

15   says you can make this, you just put in enough penetrating

16   agent so that it's going to work.  Right.

17           If there was another example that didn't work,

18   would that mean there was not anticipation?  Of course not.

19   There's anticipation.  And so I don't mean to be not

20   responding to him because I'm trying to respond to you.

21           So where we are here is once they admitted that

22   the formulation was enabled, it means that everything that

23   McDaniel teaches is true.  And when it's true, you have to

24   accept it that all those things naturally flow from it.  So

25   therefore, there is a formulation that works.  Therefore,

1   that formulation is disclosed to get these results.

2   Therefore, that formulation is disclosed to tell you that

3   it's better than metronidazole.  All those things come

4   through.

5           And when you have a formulation like Manetta,

6   which in 2012 we're looking at what was in the public domain

7   in 2012, not in the 2002.  When you look at 2012, and you

8   say what is in the public domain, you have McDaniel which

9   has been enabled by Manetta, and you will get these results

10  because it's the identical method.

11          THE COURT:  And the point of saying Manetta

12  enables McDaniel is McDaniel.  As a patent, it's presumed to

13  be enabled when it was issued; right?

14          MS. BEN-AMI:  Correct.

15          THE COURT:  But the thing about Manetta is that

16  it discloses a particular, I don't know, formulation that

17  you can make that, or saying Manetta enables McDaniel, what

18  does that actually mean to you?

19          MS. BEN-AMI:  What it means to me is it's an

20  acknowledgement that in 2012, a person skilled in the art

21  reading McDaniel would be able to practice McDaniel and

22  achieve all the results.

23          THE COURT:  And how does Manetta help in that

24  regard?

25          MS. BEN-AMI:  Because Manetta was shown to

1  obtain the results, and Manetta is a -- it falls within

2  McDaniel.

3        THE COURT:  I'm sorry, it falls within?

4        MS. BEN-AMI:  McDaniel.  Manetta is a

5  formulation of one-percent topical ivermectin that can be

6  used.  As they said, enables the formulation.  So it says if

7  Manetta is a formulation of one-percent ivermectin, that can

8  be used, and that formulation has been proven through

9  clinical trials to meet each and every element of the '118

10  patent.

11        THE COURT:  And the '118 patent is which one?

12        MS. BEN-AMI:  The patent that we're no -- the

13  '118 is the patent-in-suit.

14        THE COURT:  The '118 patent.  Sorry.

15        MS BEN-AMI:  Right.  So when they say Manetta

16  including -- it says enables the formulation, enables the

17  claims.  They're saying Manetta is a formulation that fits

18  in the claims that will inevitably, inherently every single

19  time work.  It has to work because their clinical trials

20  said it has to work.

21        Well, it's different than them saying, you know,

22  we're no longer going to argue that it's not enabled, or

23  we're going to admit that it's enabled.  They said by

24  Manetta for the formulation and including the claims.

25        THE COURT:  But what you're saying is the

1    stipulation says -- I'm not sure that I'm following what

2    you're saying right now.  The Manetta is a formulation,

3    McDaniel is a method; right?

4            MS. BEN-AMI:  McDaniel is a method with a broad

5    disclosure of formulations by saying you can.

6            THE COURT:  And Manetta is?

7            MS. BEN-AMI:  Has specific examples of

8    formulations.

9            THE COURT:  And so normally when you're talking

10   about anticipation, you're talking about the McDaniel,

11   whatever is disclosed in the 2002 understood by person of

12   ordinary skill in the art expressed and or inherent, and

13   because it's a patent is presumed enabled, but could be

14   challenged.  And so by saying Manetta enables McDaniel, are

15   you saying Manetta is disclosed in McDaniel?

16           MS. BEN-AMI:  I'm saying Manetta is a

17   formulation of McDaniel --

18           THE COURT:  And --

19           MS. BEN-AMI:  -- which necessarily will work.

20           THE COURT:  Is a formulation that's described in

21   McDaniel?

22           MS. BEN-AMI:  It's encompassed within McDaniel.

23   And when they say it enables the formulation, they're saying

24   that Manetta provides a formulation that will work.

25           MS. BEN-AMI:  And in 2012 -- I'm sorry.

```
 1              THE COURT:  No.  So McDaniel says, you know, do
 2   a method, use one, or two percent, or five-percent topical
 3   ivermectin cream.  Then Manetta comes along, it has a more
 4   specific formulation, and the use of the verb enable to
 5   connect Manetta to McDaniel, does that mean that a person of
 6   ordinary skill in the art following McDaniel would in some
 7   sense -- I was going to ask you, but in some sense would
 8   then, you know, without undue experimentation make the
 9   Manetta formulation, or does it have nothing to do with that
10   kind of enablement?
11              MS. BEN-AMI:  Oh, enablement is different in the
12   sense of anticipation, and it's slightly different.  Yeah,
13   it doesn't mean that.  It doesn't mean 112.
14              THE COURT:  Right.  Well, so that's what I'm
15   just trying to make sure that I understand which is enabled,
16   the way you're using it, is the same as disclose?
17              MS. BEN-AMI:  In effect, yeah, because he
18   says as to the formulation, he says as to the claims, as to
19   the formulation.  So when you -- and maybe that's where
20   defendants are -- enablement for anticipation, enablement,
21   112 are different things.
22              So when we look at this, you have a broad
23   disclosure in McDaniel.  McDaniel says you can make one
24   percent, and I don't think we need to worry about that.  He
25   also says is two percent, or three percent, or five.
```

```
 1                    THE COURT:  Yeah.
 2                    MS. BEN-AMI:  So he says you can make a
 3   one-percent ivermectin topical that can be used once daily
 4   and that it will get these results.  Right.  It says it will
 5   be, and we have to accept that.  That's an explicit
 6   disclosure.
 7                    It will get that result.  It will be better than
 8   metronidazole.  It can work in two weeks.  Those are
 9   explicit disclosures in the patent.
10                    THE COURT:  In McDaniel?
11                    MS. BEN-AMI:  In McDaniel.
12                    THE COURT:  Okay.
13                    MS. BEN-AMI:  And now you have a disclosure by
14   Manetta saying you have -- that it's one percent, et cetera,
15   et cetera, et cetera.  And you can get all the results that
16   a one-percent ivermectin topical will give.  And when you
17   look -- it's very important.  I would really love to go
18   through McDaniel again because it's been a while, but it's
19   very important to realize that McDaniel teaches a lot.
20   McDaniel teaches a method of treatment resulting in a
21   reduction of papules and pustules.
22                    THE COURT:  So let me just go back.  A person of
23   ordinary skill in the art reading McDaniel, does McDaniel
24   teach them the Manetta formulation?
25                    MS. BEN-AMI:  It teaches them one-percent
```

1    ivermectin formulations that work.

2              THE COURT:  Okay.

3              MS. BEN-AMI:  And that includes -- so does it

4    say two percent of this or two percent of that?  In 2002,

5    no.  But in 2012, a person skilled in the art, what did they

6    know then?  What did they read?

7              And this is not obviousness.  This is not

8    obviousness.  They know that McDaniel says one-percent

9    ivermectin will work, will get this result of lowering

10   papules and pustules.  And they say, okay, what a POSA has

11   available to him is formulations that will get you there.

12   It works.  And that's what Perricone says, and that's what

13   Bristol-Myers versus Ben Venue says.  It says as long as

14   there's enabling disclosures, that's enough.  That's it.

15   That's all it says.

16             And so what's happening here is that -- I don't

17   know that we have time to go back through all of McDaniel,

18   but I mean, if you go back through McDaniel, he says, This

19   is my theory.  I am telling you that if you put on topical

20   ivermectin one percent under these --

21             THE COURT:  You'll get the results.

22             MS. BEN-AMI:  -- you're going to get the

23   results.  Right.

24             That should be enough, to be honest with you,

25   Your Honor, for anticipation.  But furthermore, in 2012,

```
 1    they have admitted that that formulation element is enabled,
 2    that a person can do it using Manetta.  And so a POSA
 3    reading that at that time has all these teachings, and it
 4    has a further enabling disclosure by Manetta per Perricone
 5    and Bristol Myers, and the other cases that say it works.
 6              And there is this body of case law which you
 7    cited, and that body of case law stands for this
 8    proposition.  And all they're arguing now is, and it's hard
 9    to hear what they're arguing now is one could make a
10    formulation that would not work.  That would be true for
11    McDaniel, but it wouldn't meet the claim.  That would be --
12              THE COURT:  I'm sorry.  It would be true for
13    McDaniel, but it wouldn't be what?
14              MS. BEN-AMI:  Right.  You can make a formulation
15    of one-percent ivermectin that won't work, but it wouldn't
16    meet claim 1 of McDaniel because it's supposed to be
17    resulting in the cessation of the -- to get -- it says
18    resulting in getting the results.  You could make a
19    formulation under claim 6 of the '118 patent that doesn't
20    work, but as Galderma has said, the claim requires that it
21    works.  And therefore, the only formulations that are within
22    the scope of the claim are the ones that work.  These two
23    are identical.  These are identical.
24              If you look at claim 6, it can be any
25    formulation of one-percent ivermectin as long as it gets a
```

1    result.  One pimple out of a hundred over two years.  When

2    you look at McDaniel, it's the same.  Look at the claim

3    except it has one percent in the dependent claim.

4            They're the same.  They use different words

5    because he's saying you do it by killing the mites, but he

6    says putting it on the affected skin, which Your Honor has

7    already said includes papules and pustules, resulting in the

8    features that cause the papules and pustules.  And then in

9    the spec we've looked at, and he gives you examples where he

10   proves that ivermectin works, and then he says the topical

11   will work the same.

12           So when you have a broad claim like this, and we

13   have to remember we're talking about anticipation of a

14   claim, right.  If you have a broad claim like this that

15   doesn't require any specificity of formulation, and I am

16   talking about claim 6 of the '118, if one example of Manetta

17   enables that, they've admitted it's similarly McDaniel.

18   They've admitted that.  They've admitted it.

19           And so if you go back and look at Bristol Myers,

20   and I'm talking about there are two sets of claims.  The

21   second set of claims, if you go back and look at Perricone,

22   if you go back and look at the art Schering, if you go back

23   and look at all the cases you cited, they stand for this

24   proposition.  If there's one -- and I can take you through

25   metronidazole.  I can take you through the others, but I

1    don't think it's necessary because there's only infringement

2    in claim 6.  And when we look at claim 6, look how broad it

3    is.

4              THE COURT:  All right.  So thank you.  Let me

5    just hear from Mr. Wilson again for a minute.

6              MR. WILSON:  Your Honor, I was listening closely

7    and Ms. Ben-Ami is taking you down the exact same path she

8    took you in closing, and I believe it is error.  What she is

9    saying, you asked her specifically is enablement the same as

10   disclosure, and she said yes.

11             That is exactly what she's doing wrong.  She's

12   saying if something is enabled, that means it's disclosed.

13   And as the Court just pointed out, every patent is presumed

14   enabled.  If all you had to decide was is the prior art

15   enabled, and therefore, you know, it's anticipatory, that

16   would be anticipation.  All enablement means is that

17   McDaniel gets credit for saying you can make a gel, cream or

18   lotion.

19             When we stipulated to enablement of McDaniel, we

20   had previously taken the position that because McDaniel

21   didn't tell you specifically how to make a topical gel,

22   cream, or lotion, it wasn't enabled.  You wouldn't know how

23   to make one.  And we decided, talked to our experts, that's

24   not true.  You would, as of 2012, know how to make a

25   formulation.

1          At that point, it's enabled.  It gets credit for

2     disclosing broadly using a gel, cream, or lotion.  That

3     doesn't mean it discloses Manetta.  That is a combination

4     that requires obviousness.  And all the things that go along

5     with obviousness, expectation of success, secondary

6     considerations, et cetera, the Court decided not to address

7     obviousness.

8          The question on appeal and the question for

9     today:  Is there a fair question for the Federal Circuit?

10    And the question that's going to be presented to the Federal

11    Circuit is what she is saying now, which is if it's enabled,

12    it discloses Manetta.  That is fundamentally wrong.  There

13    is no support for that, and I believe there's a likelihood

14    of reversal of that issue.

15         I will also point out, and I think this should

16    be a very strong sign of whether or not there's a

17    substantial question, multiple times during the argument

18    just now she went back and argued that McDaniel expressly

19    discloses the efficacies.  They did that in their response

20    brief, too.  I was stunned.

21         They argued the decision by the Court was that

22    they were not expressly disclosed, the efficacies.  By the

23    way, it's not just that it works.  The Court knows this.  It

24    has to have significant reduction at two weeks.  It has to

25    be statistically significant, superior to metronidazole.  It

1   has to be statistically significant in terms of relapse.

2   It's not just that it works.

3            THE COURT:  Well, the disclosure for the

4   broadest claim, you know, to the extent the argument is

5   McDaniel expressly discloses the broadest claim, maybe

6   that's an argument you can make or not.  I think part of the

7   reason why I heard so little about it in the other claims is

8   saying it gets good results can't really expressly disclose

9   a lot more specific things that are actually claimed in some

10  of the other claims.

11           MR. WILSON:  Teva is trying to change the

12  Court's opinion to express disclosure.  That's what they did

13  in their response.  They spent two pages trying to argue how

14  McDaniel expressly discloses the efficacy elements of the

15  Jacovella patents.  The factual --

16           THE COURT:  Well, today it was concentrating on

17  claim 6.

18           MR. WILSON:  She's focusing on claim 6

19  intentionally.  The other claims are much more specific,

20  very, very specific benchmarks.

21           THE COURT:  Yeah, what I just said is if you're

22  going to argue that, that's the best claim to argue it for.

23           MR. WILSON:  Absolutely.  And that's why they're

24  trying to change the standard to have to prove, you know,

25  the entire case, and that's why she's saying you only have

1    to worry about claim 6 because that's the only one they

2    stipulated infringement to.

3            The question is:  Is there a chance of reversal

4    of your opinion?  And you entered an opinion that

5    invalidated all the claims.  Is there a substantial

6    question, a fair question for the Federal Circuit on that

7    issue?  And Ms. Ben-Ami getting up here and saying

8    enablement equals disclosure, your specific question is

9    wrong, that is not the law of enablement.

10           All we were agreeing to is the McDaniel, yes, in

11   2012, you would know how to make a lotion, cream or gel.

12   There's lots of ways to make a lotion, cream, or gel.  Their

13   expert said they don't know whether those other ways will

14   achieve these efficacies.  They don't know whether it's

15   inevitable and necessarily present in every one-percent

16   ivermectin formulation, and they contested infringement.

17   Not just a bad formulation, an FDA-approved formulation.

18           Teva has taken the position do not meet the

19   claimed efficacies.  That is not inherency.  That's the

20   opposite of inherency.

21           So the ultimate question in front of the Court

22   is:  Is there something that the Federal Circuit could

23   disagree with?  And the Court's conclusion was only

24   inherently disclosed based on enablement.  No citation to

25   evidence at all on whether it necessarily achieves that.

1        That is a fair legal question for the Federal

2   Circuit to decide, and then the result is if you believe

3   that's a fair question, if the Court does not issue an

4   injunction now, and the Federal Circuit agrees with

5   Galderma, the damage will be permanently done and

6   irreparable.  It cannot be reversed.

7            THE COURT:  Okay.  Thank you, Mr. Wilson.

8            MS. BEN-AMI:  Your Honor, can I respond

9   because --

10           THE COURT:  I don't think he said that much,

11  so --

12           MS. BEN-AMI:  Just as to one point, Your Honor?

13           THE COURT:  All right.  One point.

14           MS. BEN-AMI:  No slides.  No points.  They're

15  asking you to enjoin Teva.

16           THE COURT:  Yeah.

17           MS. BEN-AMI:  That's why we're here.

18           THE COURT:  I got that.

19           MS. BEN-AMI:  Well, to enjoin Teva, doesn't

20  there have to be infringement?  There's only one claim where

21  there's a finding of infringement because we stipulated to

22  it.

23           So no, the question isn't here about whether a

24  battle about all the other claims because they're asking you

25  today to take Teva's product off the market, to have it lose

1    its 180-day exclusivity, to allow --

2              THE COURT:  Okay.  I've got your point.

3              MS. BEN-AMI:  Right.  I mean --

4              THE COURT:  Thank you.  Please sit down.

5              Mr. Alibhai, how are you doing?

6              MR. ALIBHAI:  Good afternoon, Your Honor.  I

7    wanted to address some of the issues about irreparable harm

8    that the parties have addressed back and forth.

9              THE COURT:  Yeah.  You know, I'll let you tell

10   me what your biggest point is, but you know, my general take

11   on it is that there's, to quote Mr. Wilson, a sliding

12   spectrum of how hard it is to figure out what the harm is

13   from an infringement or from being on -- well, from

14   infringement.

15             And you know, I read what the comments said,

16   both sides.  I appreciated the professor, the MIT

17   professor's graph somewhere in his reply declaration.  I

18   think he probably has it roughly right, but you know, all

19   the time in infringement cases, you're usually -- all the

20   time, you've got some period of time that's in the past, and

21   you're trying to figure out what that's worth, and you have

22   some period of time in the future, and you're trying to

23   figure out what that's worth.  And it's really just a

24   question of how difficult to do it is.  So that's one thing.

25             And then the other thing is, you know, you've

1     got a 170-person Galderma unit that sells things.  They

2     won't be needed.  You know, Teva is going to have some

3     group, maybe it's 170 people.  It will be fewer because

4     they're a generic that will be trying to sell things and

5     fill orders.  You know, it's pretty fine distinctions.

6              So it seems to me that your better argument is

7     what Mr. Wilson was saying not what your economists are

8     saying.  But with that in mind, go ahead.

9              MR. ALIBHAI:  Well, I'll start with the first

10    argument which is, Your Honor, I think Mr. Wilson today laid

11    out an excellent case of why there's a fair question, a

12    substantial question of --

13             THE COURT:  Okay.  But he did a fine job without

14    you repeating it.

15             MR. ALIBHAI:  And so the point is that what's

16    the question of the irreparable harm and what's the harm to

17    Teva versus what's the harm to Galderma.  The only harm

18    that's been identified by Teva at all, as I read through all

19    the papers and the declarations, was that they're going to

20    lose their 180-day exclusivity.  That's all I saw, and the

21    response to that is that has been contractually protected by

22    virtue of the Perrigo agreement.

23             And so the way this works is if the Court enters

24    an injunction today, and then we go up on appeal, and

25    somehow the Federal Circuit affirms and the injunction goes

 1    away, Teva can go and launch again.  And during --

 2                THE COURT:  So I am correct in thinking that if

 3    I were to enter an injunction today, one thing that I'd be

 4    doing is requiring you to post a bond of like a million

 5    dollars a day or something to cover them down the road in

 6    case I wrongly entered the injunction; right?

 7                MR. ALIBHAI:  Well, it wouldn't be a million

 8    dollars a day.  This is a market that has net sales of

 9    approximately 90 million a year.

10                THE COURT:  All right.

11                MR. ALIBHAI:  And all --

12                THE COURT:  So $250,000 a day?

13                MR. ALIBHAI:  Well, it wouldn't be that much.

14    Again, we can talk about the bond, but it wouldn't be that

15    much because they are not losing that money.  They're going

16    to have the right to go get that money in the future.

17                So what would happen -- and yes, a bond is one

18    way to protect any harm that we think may exist to Teva, but

19    let me explain why there's no harm at all.  The reason is

20    that if the Court enters an injunction today and they can no

21    longer sell their product, the authorized generic will be

22    removed from the marketplace.

23                Perrigo will not be able to enter the

24    marketplace by virtue of paragraph 5B of their license

25    agreement with Galderma.

1          The case will go forward on to an appeal.  The

2     Federal Circuit will decide.  Let's assume worst-case

3     scenario for Galderma that the Federal Circuit affirms

4     completely, and that's a final decision.  Forget whether the

5     Supreme Court reviews it or not.  They can launch at that

6     time.

7          By virtue of paragraph 5B of the Perrigo

8     agreement, Perrigo cannot go to market until 181 days after

9     Teva's been on the market.  So that 180-day exclusivity has

10     been built in contractually to the license agreement between

11     Galderma and Perrigo.  And there is no other ANDA filer that

12     we're aware of, and no other ANDA filer would be able to get

13     to market in the next year any way even if one came along

14     later.

15          So the only harm that they argued is this

16     180-day exclusivity issue.  Not only will they have their

17     180-day exclusivity sometime in the future, if they're

18     right, they've also made money off of the last two weeks and

19     whatever sales they've been able to accomplish because they

20     have presumably flooded the market.  So they'll get two

21     chances to get to the marketplace.

22          And what Mr. Gambino and Dr. Hausman will talk

23     about is that Soolantra is a new product.  Right.  It came

24     in 2015, had growth every year.  When they get this

25     marketplace in a year, it will be even stronger than it has

1    been the year before.

2              THE COURT:  I think the growth over a year,

3    isn't it -- I don't remember the general trend.  It was not

4    predicted to be much this year.  It seemed like the price

5    was rising faster.  So the growth is not actually like

6    number of units sold, it's just more profits because you're

7    charging more; right?

8              MR. ALIBHAI:  I think it's both.  I think it's

9    the revenue.  There's price increases as well as growth in

10   that marketplace.  Today Soolantra is approximately -- has

11   about 16 percent of the rosacea market treatment, even

12   though there's all these generics and all these other things

13   out there, and it's the number one branded.

14             As the Court will presumably remember from the

15   trial, this was the number one branded drug for rosacea.

16   It's Finacea.  One of them went generic.  There's another

17   Finacea product, but this is the one -- number one brand.

18   So this is a graphical representation of what that market

19   has looked like every year, and it's projected to beat this

20   year what it did last year.

21             And so the point is that's the harm to Teva.

22   We've shown how that harm will not come to fruition both

23   because of the contractual agreement, both because this is a

24   growth market, and there's a good market there.

25             On the other side, there is actual tangible harm

1      to Galderma.  The first is what the Court talked about, an

2      entire set of people whose job it is to promote this

3      product, to create information about rosacea.  That

4      treatment will be laid off, will lose their jobs, and will

5      not be able to do this job anymore because Galderma will not

6      have a need for them to do that job anymore.

7                  THE COURT:  When are they going to start being

8      laid off?

9                  MR. ALIBHAI:  I think it depends on what happens

10     with these injunction and proceedings here, and if

11     necessary, at the Federal Circuit.

12                 THE COURT:  So I take it in the last two weeks,

13     nobody's been laid off?

14                 MR. ALIBHAI:  No.  We're hopeful that the Court

15     will enjoin them so we have not laid anybody off.

16                 The second irreparable harm that's not addressed

17     by Teva, and they had a copy because Your Honor ordered the

18     production of the Perrigo agreement, and it went out that

19     day.

20                 THE COURT:  Yeah.  I could tell that they had

21     it.

22                 MR. ALIBHAI:  If the Court does not enjoin Teva

23     today and the appeal goes forward, in approximately 165 days

24     when their 180-day exclusivity expires, Perrigo will be able

25     to launch their product.  In the event that the Federal

1    Circuit reverses and the case is remanded back to this

2    court, and Your Honor or a jury determines that there was

3    infringement, and the patent is valid on the other arguments

4    that they made and their potential damages against Teva,

5    what will never happen, what will never happen unless this

6    Court issues an injunction is that Perrigo will stay on the

7    marketplace because nothing stops Perrigo from going to

8    market 180 days -- 181 days after Teva goes on the

9    marketplace without an injunction.

10            And that's an important provision in that

11   paragraph 5b.  There's two paragraphs in this.

12            5b, the second paragraph says that if the Court

13   enters and if we seek an injunction, and an injunction is

14   entered within that 90-day period, the question you were

15   asking was, the 90 days, is it enough time to allow the

16   parties to move for an injunction and for the Court to have

17   the time to consider and grant one.

18            If it happens in that 90-day period, then it's a

19   complete reset.  It says if there were no launches, if there

20   was no activity by the first filer --

21            THE COURT:  Yeah, that's what Mr. Wilson said.

22            MR. ALIBHAI:  Right.  And so there's another set

23   of harm that will occur if Teva's not enjoined is that

24   Perrigo will go to the marketplace.  And even if we're

25   right, even if the Federal Circuit reverses, that's

1    something that we won't be able to fix or remedy.  The

2    marketplace will still be dominated by generics.  Even if

3    Teva's removed at some point, it will be a year plus from

4    now, even if we're able to get damages from Teva, that will

5    not affect our ability to go after -- there will be no

6    damages from Perrigo.

7            And so that's irreparable harm.  And given just

8    those two things, Your Honor, I think that both the fact

9    that Perrigo can go into the marketplace and that there's a

10   number of people who would lose their jobs over this, and

11   combined with the questions we've raised, that's sufficient

12   to enter an injunction to preserve the status quo which was

13   the Court issued an opinion regarding one argument that was

14   made, and that we believe has questions that should be

15   addressed and allow that question to be addressed.

16           And given that they would suffer no harm during

17   that time other than the loss of exclusivity that they're

18   just going to push forward, it's not a loss, they're just

19   going to have that right if they're right.  If they're not

20   right, they won't get their exclusivity, they'll just get

21   the money that they made over the last few weeks.

22           And so with respect to the issues that they

23   raise, they talked about the authorized generic, and they

24   talked about the delay.  You know, I was surprised when

25   Ms. Ben-Ami told Your Honor that they were surprised that we

```
 1    filed a motion.  If you saw the evidence, you didn't mention
 2    my declaration, but there was a declaration by me.
 3                THE COURT:  I did, you know, and I don't mean
 4    this in the context of you personally, but when I get a
 5    bunch of affidavits, the least important one to me is the
 6    one that's signed by the attorney.
 7                MR. ALIBHAI:  I understand that it is, and
 8    that's why I attached the emails to show Your Honor.
 9                THE COURT:  And I did see that it was the back
10    and forth.  I was just less interested in that.
11                MR. ALIBHAI:  Well, and I bring that up because
12    they try to make this argument about delay.  They knew full
13    well that we intended to seek injunctive relief if
14    necessary.  We were not aware that they were going to
15    launch.  They were not going to tell us.  They did not give
16    us notice, and at no point did they tell us in the second
17    case in which we've served discovery that, by the way, we
18    know you've asked before, we're going to do this.  If you
19    want to move for an injunction, go for it.  If you want to
20    expedite briefing, we should discuss all that.
21                They decided to put themselves in the situation.
22    Judge Robinson and other judges have said you risk your own
23    180-day exclusivity in that situation in the In Re:
24    Cyclobenzaprine case.  But again, not an issue here because
25    contractually their exclusivity is protected between
```

1    Galderma and Perrigo's agreement.

2              The market share argument is an important one

3    here as well, Your Honor, because while we do talk about

4    damages, and we talked about the chart that Dr. Hausman has

5    on Page 10, I believe, of the affidavit, the declaration,

6    this is a very crowded marketplace.  And there's generic

7    metronidazole.  There's a Finacea product that's generic.

8    There are doxycycline products.  There's Oracea which is an

9    oral product sold by Galderma as well.

10             And one of the things that will happen is there

11   will be all kinds of movement in this marketplace between

12   products if there's not an injunction issued because people

13   will be changing around, buying different things, and it

14   will be impossible for us to know where we lost that market

15   share to.  Because it's not binary that it's just Galderma

16   and Teva out there, it will be Galderma, Teva, and Perrigo

17   out there.

18             And in addition, there will be all these other

19   things out there.  Dr. Hausman was the expert in this Plavix

20   case, and in the Plavix case that Mr. Hofmann refers to,

21   Plavix had 91 or 92 percent of the marketplace.

22             THE COURT:  Yeah.  I mean, I saw the Plavix

23   thing, and that seemed to me that was just, for lack of a

24   better word, a data point that was out there.  I mean, you

25   know, and to some extent, too, I think when you have the MIT

guy, you know, when there's this study that shows this and this study that shows that, and you know, and to some extent, the study may be more important than what happened in Plavix.  But you know, the just pointing to random examples where things happened doesn't really strike me as having much persuasive value.

MR. ALIBHAI:  And I think if we look at the situation based upon the evidence that was presented at trial is that, like I said, this was a crowded marketplace.

THE COURT:  Yeah.  Yeah.  No.  No, but I do believe that.  Yeah.

MR. ALIBHAI:  And so looking at this situation, there's going to be a loss of market share for Galderma, and it's going to be impossible to quantify what happened to that market share at some point in the future.  And I think that's what Dr. Hausman, the MIT professor, is talking about is that when it comes to future damages, and you try to figure out where would you have been had there never been this entry by Teva in the event that the Court finds that it was improper, then how do you determine what happened to your market share based upon what happened because of Teva, what happened based on Perrigo, what happened because of metronidazole, or other many drugs that are in this marketplace.  And that's the type of harm that, because it's impossible to quantify and because there's no way to

1    determine the damages for that future harm, is considered

2    irreparable harm.  And the Federal Circuit's definitely said

3    that erosion of market share is one of those types of

4    things.

5              The other thing that we haven't talked about is

6    price erosion.  It is undisputed that there is a drop in

7    prices when generics come into the marketplace.  And when

8    two generics come into the marketplace, which is what will

9    happen in 165 days when Perrigo enters the marketplace as

10   well if there's no injunction, is that there's going to be

11   Teva and Perrigo competing with each other.  And in order to

12   compete, they're going to have to offer the lowest price

13   possible in order to get a pharmacy or distributor to choose

14   their product, especially over their branded product, and to

15   choose which one of them to take.

16             During that time, what happens in the

17   marketplace is that the formulary or the tier that

18   Galderma's branded product is on drops.  Right now it's tier

19   two which means that the co-pay is a certain price.  And

20   what happens is insurance companies will say, We're not

21   going to allow an insurance -- the pharmacy to fill the

22   branded drug product.  And even if those products are taken

23   off in the marketplace -- and by the way, the only thing

24   that can happen down the road is that Teva's product is

25   removed from the marketplace.

1              In the event that the Federal Circuit -- if

2        there's no injunction issued, the Federal Circuit reverses,

3        and then this Court issues an injunction, or there's a trial

4        and the Court orders an injunction, but Perrigo's product

5        stays there.  Galderma's product never goes back to tier

6        two.  It stays at tier three.  It stays as a branded drug

7        that is disfavored, and it can never recapture the price

8        that it was going to sell at before.

9              So we've cited a number of cases in which the

10       Sanofi case which involved Plavix, the Cyclobenzaprine case

11       by Judge Robinson where they talk about these types of

12       harms, market share, price erosion that are cognizable

13       irreparable harms.  What makes this case different than all

14       the cases we've cited, all 42 of them that I've looked at is

15       that there's no situation like this where you're going to

16       ensure that another generic comes into the marketplace and

17       which can't be undone.  That is the very definition of

18       irreparable harm.

19              And so for all the reasons we've laid out and

20       that Dr. Hausman explains in his declarations and          Mr.

21       Gambino explains with specificity as to what happened at

22       Galderma specifically, including the R & D and the rosacea,

23       that education that Galderma's definitely supported for

24       years because this has been an important part of their

25       dermatological program is this issue with Perrigo and how

1    it's not addressed by them and can't be remedied down the

2    road.

3              And so we'd ask that the Court issue an

4    injunction until the pendency of the appeal through the

5    completion of the appeal, and then depending on what happens

6    on the appeal, we'd have to look at what happens next.  But

7    if they're right, they're going to launch at the end of this

8    appeal.  If they're wrong, then we kept Perrigo off the

9    marketplace, which should have happened because there should

10   have not been a launch by Teva if they're wrong, and Teva's

11   kept off of the marketplace after the few weeks of profits

12   that they've already made.

13             THE COURT:  All right.  Thank you, Mr. Alibhai.

14             MR. ALIBHAI:  Thank you, Your Honor.

15             MR. FLEMING:  Good afternoon, Your Honor.

16             THE COURT:  Mr. Fleming.

17             MR. FLEMING:  Yes, sir.  Good to see you again,

18   Your Honor.

19             Thank you.  So Your Honor, I want to upfront --

20   and I am going to focus on just irreparable harm.  I'm not

21   going to talk about merits.

22             THE COURT:  I had thought as much.

23             MR. FLEMING:  But I want you to understand that

24   while there may be harm, it's not irreparable harm.

25             THE COURT:  So what about the thing that

1    Mr. Alibhai is concentrating on which is the scenario that I

2    don't grant the injunction, the Federal Circuit doesn't

3    grant an injunction, Perrigo enters?

4              MR. FLEMING:  Let me explain to you the status

5    quo.  I think that's what you're getting to.  You're getting

6    at the Perrigo, what's going to happen if you do and if you

7    don't grant the injunction.

8              THE COURT:  Okay.

9              MR. FLEMING:  All right?

10             THE COURT:  If you know the question I'm asking,

11   go ahead and answer it.

12             MR. FLEMING:  I think I do because, first of

13   all, let me tell you, with all due respect to counsel here,

14   they have completely mischaracterized the Perrigo contract.

15   And they were able to do that because they never showed it

16   to you, but I'm going to show it to you.

17             And what I'm going to show you, Your Honor, is

18   the bullet point from the bottom where is:  What is the

19   status quo?  The status quo is a creature of a contract that

20   Galderma entered into with Perrigo.

21             So this is a self-inflicted wound, Your Honor,

22   because in that contract, it has two triggers for Perrigo to

23   come on the market in 180 days -- actually sooner, but I'll

24   show you the contract.  Let's go to page -- go to slide 35.

25             This is the contract for Perrigo.  And Perrigo

1   has two triggers in this contract, Your Honor.  The first

2   trigger is an unauthorized generic.  That's Teva.

3            The second trigger is an authorized generic.

4   It's an alternative trigger.  The provision that they talk

5   about where you have to file for an injunction, and then you

6   have 90 days, and if it's granted, that doesn't apply to B,

7   the second trigger.

8            In their contract, what it says is if all of

9   this happens, you go to the next trigger date which has

10  already happened with the authorized generic.  They chose to

11  launch the authorized generic.  They chose, by virtue of

12  their contract, to give Perrigo the right to come on.

13           The only thing stopping Perrigo now is our

14  market exclusivity.  That market exclusivity doesn't get

15  preserved.

16           Under the FDA regulations, which we cited to in

17  our brief, it runs uninterrupted.  So if you were to perhaps

18  enjoin Teva, 180 days from now that market exclusivity is

19  gone.  And if you look under the Perrigo agreement, the only

20  180-day delay was from an unauthorized generic because they

21  know they already have market exclusivity.

22           Under B, there's no 180-day contractual delay.

23  So by virtue of Galderma's own conduct in launching their

24  authorized generic, they have triggered Perrigo.  So the

25  status quo is, by Galderma's own doing, the Teva generic,

1    the authorized generic, and the soon-to-enter Perrigo.

2            So what will happen if you enjoin Teva is you

3    will leave -- maybe the authorized generic comes off, maybe

4    it doesn't because -- and I'll tell you it may not in a

5    second.  But Perrigo's coming on in six months.  You've seen

6    nothing in these papers from Perrigo saying, oh, yeah, we're

7    going to agree to this interpretation of the contract.

8    Every time they talk about, well, we'll just reinstate this

9    180 days, there's no citation.  Nobody from Perrigo came

10   forward and said it.  Nobody from Galderma came forward and

11   put in an affidavit and said that's our interpretation of

12   this contract.  That's just what the lawyers are telling

13   you, and that's not evidence, Your Honor.

14           But the contract is clear that the second

15   trigger by Galderma's own doing has already occurred.  And

16   if that's already occurred, the only -- Perrigo's coming on

17   in 180 days.  And I guarantee you Perrigo, who's not a party

18   to this case, is not going to say, oh, well, you know,

19   Galderma's a good guy.  We filed and accepted a settlement

20   agreement, and we're not going to do it.

21           THE COURT:  So Mr. Fleming, hold on.  Hold on a

22   minute.

23           So Mr. Alibhai, I did see this in the briefing

24   in fine print somewhere.

25           MR. FLEMING:  Hopefully not in a footnote.

```
 1                    THE COURT:  Yeah, I can't remember.  I just
 2      remember fine print.
 3                    What do you have to say about this subsection B
 4      here?  Because I -- well, just why is Mr. Fleming wrong?
 5                    MR. ALIBHAI:  Because Mr. Fleming is not reading
 6      the entire paragraph.
 7                    THE COURT:  Okay.  Well, tell me what --
 8                    MR. ALIBHAI:  So the first part of the paragraph
 9      is there has to be a first applicant that markets a generic
10      product.
11                    THE COURT:  Yeah.  Yeah.  Use the highlighter
12      because it's a lot of words there.
13                    MR. ALIBHAI:  Can we go back to the previous
14      page?  So and I think that was -- I think he had that part
15      correct.
16                    So the first applicants, so it's provision A,
17      181 days after the first applicant goes to market.  That's
18      what triggered Perrigo's right to go to market, the first
19      thing that happened ever.
20                    THE COURT:  The third party is Teva here; right?
21                    MR. ALIBHAI:  The third party who is the first
22      applicant, that's right.  So Teva --
23                    THE COURT:  So the first applicant is Teva?
24                    MR. ALIBHAI:  Right.
25                    MR. FLEMING:  A is Teva.
```

```
 1                 THE COURT:  Okay.  Sorry.  Yes.
 2                 MR. ALIBHAI:  So Teva first markets a generic
 3      product.  That's happened.  That happened first.
 4                 Thereafter, a third party, which is the
 5      authorized generic, who is authorized by Galderma again
 6      marketing a generic product.  So first Teva went to market.
 7      Then the authorized generic went to market.
 8                 The next paragraph, still 5b says --
 9                 THE COURT:  Wait.  Why are you changing?
10                 MR. ALIBHAI:  I'm going to -- he doesn't have --
11      I was using their slide.
12                 THE COURT:  And I'm sorry, can you just go back
13      to the slide we were on?  So go to letter B there, B, the
14      license of the patent shall be earlier than A, and blah,
15      blah, blah, presumably or B --
16                 MR. ALIBHAI:  Well, there's C, D --
17                 THE COURT:  Okay.
18                 MR. ALIBHAI:  -- or E.
19                 THE COURT:  But I take it they're irrelevant to
20      our discussion?
21                 MR. ALIBHAI:  They're down the road.
22                 MR. FLEMING:  All the patents are expired or
23      invalidated.
24                 THE COURT:  Okay.  I can barely understand
25      what's relevant, so let's not think about irrelevant.
```

1                 Okay.  So go ahead, Mr. Alibhai.

2                 MR. ALIBHAI:  So this section is called the

3     Licensed Patents Effective Date, it's got A through E.  This

4     is the actual agreement which is attached as an exhibit to

5     their response as well as to the declaration of Dr. Hausman.

6                 THE COURT:  Okay.

7                 MR. ALIBHAI:  And the paragraph continues, "In

8     the event that Galderma becomes aware of the actual date

9     under A or B shall give notice."

10                THE COURT:  Right.  So here's where a little

11    highlighting would be helpful.

12                MR. ALIBHAI:  Okay.  Ms. Chen, can I have you do

13    that instead of me so I don't do this wrong?

14                So then it says -- this is still paragraph 5b,

15    so we're in the same paragraph, "Perrigo acknowledges and

16    agrees that the license granted under this Section 5" -- so

17    what we just talked about, all of it is Section 5 -- "does

18    not become effective should a sale occur of a Generic

19    Product that has not been authorized or licensed by Galderma

20    unless Galderma did not within ten days seek a TRO."

21                So the entire license that would have become

22    effective under paragraph 5 based upon Teva's first launch

23    or even the responding authorized generic launch does not

24    become effective if we seek a temporary restraining order,

25    and keep going down, if within -- if we do that within ten

1    days, the license shall be effective on the earlier of the

2    date the TRO is denied or 90 days after it was filed.

3              And then if we keep going down, it says, If a

4    TRO prohibited any further sale of such unauthorized generic

5    product is entered, which is what will happen if the Court

6    enters an injunction, a TRO will be entered prohibiting any

7    further sale of such unlicensed generic product.  The

8    licenses shall not become effective until the occurrence of

9    the next applicable licensed patent's effective date.

10             So the Court will enter an injunction today, and

11   thereafter, sometime in the future, either one of those

12   things in five has to happen again.

13             THE COURT:  So maybe I missed it while you were

14   doing all of this, but in the earlier thing where there was

15   an A and a B, this relates to both A and B?

16             MR. ALIBHAI:  This relates to an unlicensed

17   product which is A, but it relates to all of the licenses.

18   The first sentence says, "Perrigo acknowledges and agrees

19   that a license granted under this Section 5," and this is

20   all Section 5.

21             MR. FLEMING:  Keep reading, should there

22   occur --

23             THE COURT:  Well, so Mr. Fleming --

24             MR. FLEMING:  Sorry, Your Honor.  I was just

25   helping.

1          MR. ALIBHAI:  It's not helpful.  Does not become

2    effective until all these things, and it says it resets.

3    And that's the way the agreement is drafted, that there's a

4    complete reset if there's an injunction.

5          Now, Mr. Midgley is here if Your Honor wants to

6    hear from Galderma to say, yes, we agree with this

7    interpretation, but this is an issue of contract

8    interpretation.  So I'm not suggesting --

9          THE COURT:  From Perrigo, you mean?

10         MR. ALIBHAI:  No, Mr. Midgley from Galderma is

11   here.  He said, Well, nobody from Galderma submitted an

12   affidavit on this.  To me, this is an issue of contract

13   interpretation, so it's for Your Honor to decide.

14         So --

15         THE COURT:  Hold on just a minute.

16         MS. BEN-AMI:  Your Honor, would you like a hard

17   copy?

18         THE COURT:  Sure.

19         MR. FLEMING:  Do you need me to say something so

20   I can explain my position?

21         THE COURT:  No, that's okay.  Let me try to

22   figure out Mr. Alibhai first.  Which page is this?

23         MR. FLEMING:  Page --

24         MR. ALIBHAI:  Pages 6 and 7 is Section 5b.

25         THE COURT:  So basically the dispute here is

1    that the position of Galderma is that this large paragraph,

2    the stuff that's up on the screen that's on Page 7 which

3    seems to be referring to a third-party launch is something

4    that basically -- the things that are described in this

5    paragraph happened because of the third-party launch.  All

6    the other things that are in paragraph B become inoperative.

7             Whereas I take it the defendant's position is

8    this only relates to what happens if paragraph A is the

9    reason for the licensed patent's effective date.

10            That's the two positions; right?

11            MR. FLEMING:  That is correct.

12            MR. ALIBHAI:  Correct.

13            MR. FLEMING:  Because there's the expressed

14   carve-out in that because it says the rights under B should

15   there be an unauthorized generic.  That's the A situation.

16   It says nothing about the authorized generic, and we talked

17   about the unauthorized.

18            But the authorized generic is a separate

19   trigger.  So you can have a situation, Your Honor, where

20   there is no authorized generic, which this contract

21   contemplates, and it's only at Teva, unauthorized generic

22   that's out there.  And if that happens, then they come in,

23   and they sue, and they try to stop it, and that makes sense.

24            However, B is a separate trigger which is the

25   authorized generic gives Perrigo rights, too.  So even if

1    you follow what's in the sentence, you see it says the next

2    applicable licensed patent effective date which is triggered

3    by B, the authorized generic which Galderma initiated on its

4    own conduct.

5              So these are two separate triggers, and this

6    whole 90 days and the injunction, this whole provision is

7    only a carve-out of the rights should there be an

8    unauthorized generic.

9              THE COURT:  So I think I understand what you

10   just said there, Mr. Fleming, essentially which is

11   essentially that this paragraph, the big paragraph we're

12   talking about applies to A, and Galderma's presumably doing

13   what's required by that.  But then the launch two days

14   later, whatever it is that the authorized generic is, then

15   the next applicable licensed patent's effective date?

16             MR. FLEMING:  That's exactly it, Your Honor.

17   And by virtue of that, now there's an authorized generic.

18   And in six months, by April of 2020, there's going to be

19   Perrigo on the market as well.  They're coming on.

20             THE COURT:  I can't say that I'm going to be

21   able to resolve this sitting here right now, but at least I

22   understand, Mr. Fleming, your position.

23             And Mr. Alibhai, I understand yours, but you can

24   certainly talk more about it.

25             MR. ALIBHAI:  Let me tell you more why it's not

1    the way that they are reading it because they keep saying

2    this 5a thing; right?

3                THE COURT:  Yes.

4                MR. ALIBHAI:  The first sentence of the second

5    paragraph 5b, the first full paragraph on Page 7, it says,

6    "Perrigo acknowledges and agrees that the license granted

7    under this Section 5" -- it doesn't limit it to A.  It says

8    this Section 5.  This is all Section 5 we're talking about.

9                And then go down to the last two lines of that

10   paragraph, the licenses plural.  So whatever happened

11   before, plural.  The licenses shall not become effective

12   until the occurrence of the next applicable licensed

13   patent's effective date.

14               So we reset after the injunction.  There are no

15   licenses.  That's what it expressly says.

16               And by the way, Your Honor, if Perrigo tries to

17   launch, Galderma will seek an injunction against it because

18   it will not have been licensed under this agreement.  If

19   this Court issues an injunction, Galderma has expressed that

20   it will seek an injunction against Perrigo because no

21   licensed patent effective date has occurred.

22               THE COURT:  Okay.  Well, I'm not sure what your

23   point is about the licenses on the next-to-the-last line of

24   this being plural.

25               MR. ALIBHAI:  Because they're trying to say it's

1    an A thing, not a B thing.  They're trying to parse this

2    out.  The way this entire paragraph is written is that the

3    license granted under the Section 5, it's talking about the

4    entire Section 5, and it's talking about all the licenses

5    shall not become effective.  So whatever happened before

6    doesn't happen until the occurrence of the next applicable

7    licensed patent's effective date.

8                   THE COURT:  So let me ask you this:  So if Teva

9    had not launched, but instead you authorized Prasco to do

10   the authorized generic, then this whole big paragraph would

11   be completely irrelevant, and Perrigo could just, pursuant

12   to the subsection B, launch?

13                  MR. ALIBHAI:  No, because Perrigo could never

14   launch until Teva's 180-day exclusivity was -- the other

15   only thing that was causing --

16                  THE COURT:  So they could wait 180 days even

17   though Teva can't do anything?  Oh --

18                  MR. ALIBHAI:  180 days after Teva launches.  So

19   the statutory protection that Teva has, even if a license --

20   even if the license becomes effective as to Perrigo, it's

21   still precluded from going to market until Teva goes to

22   market first, unless Teva has forfeited, waived, or

23   relinquished its exclusivity.

24                  So yes, even an authorized generic would not

25   have put Perrigo on the market.  The only thing that put

1    Perrigo on the market was Teva's launch.

2              THE COURT:  And so actually, there must be an

3    obvious answer to this, why doesn't Teva's exclusivity keep

4    you from doing the authorized generic?  Is that just a

5    different provision of the statute?

6              MR. FLEMING:  Yes, it doesn't apply.

7              MR. ALIBHAI:  It doesn't apply.

8              THE COURT:  I said there might be an obvious

9    answer.

10             MR. FLEMING:  Well, Your Honor, the generic is

11   essentially a loophole in the law actually, and I would like

12   to talk -- I'll talk to you for a few minutes about what

13   that means for them.

14             THE COURT:  All right.  So Mr. Alibhai, I should

15   give Mr. Fleming a little bit more time.  Okay?

16             MR. ALIBHAI:  Sure.

17             MR. FLEMING:  And Your Honor, you put your

18   finger right on it, Your Honor, because what it says there

19   is they agree that the grant under Section 5 does not become

20   effective should it occur of a generic product that has not

21   been authorized.  So the only carve-out of that big

22   paragraph is for an unauthorized generic.

23             Let's assume Teva wins, but they waive their

24   180 days, and they launch an authorized generic.  That means

25   under their provision, Perrigo comes into the market right

```
 1    away, and they can't stop them.  That's their contract.
 2    They've done it.  They may want to rewrite this, Your Honor,
 3    but that's the contract they have.
 4              And by virtue of them launching the authorized
 5    generic, they have implicated the trigger.  And by
 6    implicating the trigger, they gave Perrigo the rights, and
 7    those rights run.  And to change the marketplace now will
 8    only harm Teva.
 9              Why?  Because 180 days, as you saw in the
10    briefing, the FDA regulations, runs from the time it was the
11    launch of Teva, and it runs uninterrupted.  And Your Honor,
12    I suspect that it's going to take more than six months for
13    whatever is going to happen in the Federal Circuit to
14    happen, and that would mean that the valuable -- the most
15    valuable assets sometimes for generic launch is that
16    exclusivity, as you know.
17              THE COURT:  Yeah, I have heard that before.
18              MR. FLEMING:  And that will be lost.  So that is
19    what is really here.  And the reality is the status quo is
20    that there's three generics in the marketplace, and it's due
21    to Galderma.  As much as they want to push it on Teva, it's
22    Galderma's own doing because that's the contract they
23    signed.  Maybe they don't like it.  Maybe they think -- they
24    probably shouldn't have launched the AG and then they
25    wouldn't have that long paragraph.  But they launched, and
```

1    they took it.

2              But what does it mean for them to launch?  Can

3    we go back to 31 for a second?  Thirty-one, please.  Okay.

4              And let's look at the last line.  So let me

5    explain a little bit about the situation with Prasco.  Maybe

6    Your Honor may not be entirely familiar, so what happens is

7    when Galderma authorizes Prasco to distribute what is

8    essentially Soolantra, they enter into a contract.  And

9    under that contract with Prasco by industry standards,

10   Galderma receives 90 percent of the profits that Prasco

11   receives from selling.

12             THE COURT:  And your point is?

13             MR. FLEMING:  My point is that they're receiving

14   a tremendous amount of value through the sales of the AG.

15   They're not out there losing.

16             THE COURT:  Yeah, but I assume from the branded

17   thing that you're receiving 98 percent of the profits.

18             MR. FLEMING:  That's not necessarily true, Your

19   Honor, because if you remember -- could I have slide 32?

20             So if you remember, Mr. Hofmann did an analysis.

21   Remember the CareConnect and the discounts and rebates that

22   Galderma had to give to get to the zero co-pay?  They were

23   giving up already more than 52 percent of the WAC price to

24   get down there.

25             But what's really important to consider, Your

 1    Honor, is people like Dr. Gallo who couldn't prescribe

 2    Soolantra when it was a branded product because the VA

 3    wouldn't pay now can actually prescribe it because it's an

 4    authorized generic.  And so what they probably did by

 5    issuing the authorized generic is expand their marketplace

 6    to all of those entities that couldn't otherwise do it.

 7              But Your Honor, let's go back to 31.  These

 8    harms, should they even occur because there's no evidence

 9    that anything has occurred, should they even occur are all

10    remedial by money:  lost sales, price erosion, market share

11    erosion.  These are the quintessential patent damages,

12    parade of horribles that are quantifiable and have been

13    quantified in your Court, I'm sure, time and time again.

14              THE COURT:  Usually a lot of argument from the

15    defendant.

16              MR. FLEMING:  But it's only as to quantum, Your

17    Honor.  They only argue as to quantum.

18              THE COURT:  No, there's lots of arguments that,

19    no matter what methodology, the plaintiff does not comply

20    with any known economic standard.

21              MR. FLEMING:  Yeah.

22              THE COURT:  You probably made those arguments a

23    few times yourself.

24              MR. FLEMING:  I wouldn't be surprised, Your

25    Honor, but it's become a hot bed of dispute.  But one thing

```
 1   to understand, this parade of horribles about the lost
 2   revenues, this product is but three percent of Galderma's --
 3              THE COURT:  But I do think, you know, they're
 4   not saying that you're driving them out of business, so I
 5   don't see what the fact is whether they're a big company
 6   like they are or even bigger company, as I think you are,
 7   what difference does it make?
 8              MR. FLEMING:  Well, first of all, what it makes
 9   a difference on is when they say, well, we're not going to
10   have any money for our R&D, and we're not going to have any
11   money for research and development, well, that's just not
12   true, not from the looks of this.
13              THE COURT:  No.  No.  I --
14              MR. FLEMING:  That's what I'm addressing there.
15              THE COURT:  Okay.  Yeah.  Yeah.
16              MR. FLEMING:  That's what I'm addressing.
17              THE COURT:  Yeah.  You know, every time you take
18   a dollar away from somebody, you have to decide how they're
19   not going to spend that dollar.
20              MR. FLEMING:  Right.  And so fundamentally,
21   fundamentally, when the customers that are lost -- and as
22   they say themselves, these market players, whether it's
23   metronidazole or Finacea, that's all -- they're already out
24   there competing.  You know, they already know who gets what
25   shares of market and who gets what customers.
```

1        So should there be this proof that Teva's

2   product is taking customers away, they know where it's going

3   to come, and they know how to count them.  They know how

4   many units, you know, how much profit.  That's all

5   quantifiable money, damages, quintessential stuff.

6        Those are not irreparable, Your Honor.  And

7   while I never want to talk about anybody losing their jobs,

8   I hate even the concept of that, in this industry, people

9   get put on, people get taken off, people get reallocated.

10  It's not their only product in this branded area.  It's not

11  the only product that they're selling.  And that's something

12  that can be readjusted should there come a time where

13  they're ultimately taking everybody else off the market.

14       But more importantly, what's really the key here

15  for you, Your Honor, is that they have created a situation

16  where there will be a genericized ivermectin market because

17  of their own contacts -- because of their own conduct and

18  because of their own contract.  That is the status quo.

19       And everything else that follows through this,

20  the lost sales or the lost price erosion, that's all going

21  to be quantifiable and remedial.  That's all going to be

22  there.

23       What's not remedial, what's not curable, what's

24  not fixable is the loss of market exclusivity and the value

25  that that has to a generic who's undertaking the effort to

1    come to a Court like yourself and ask for your ruling and

2    take the patents that were in the Orange Book.

3              THE COURT:  I think they were the ones who -- no

4    actually, I guess, in this case, you guys were the ones who

5    came here.  Yeah, that's right.  Okay.  I remember that.

6              MR. FLEMING:  Thank you.  Your Honor.

7              THE COURT:  All right.  Anything else,

8    Mr. Alibhai, that you want to say?

9              MR. ALIBHAI:  Just a couple quick points, Your

10   Honor.  The argument that was just made to you about erosion

11   of markets, customers, and prices, the Abbott case we cited,

12   the Purdue case we cited, and the Sanofi Cipla Lab case we

13   cited say that that is rarely reversible.  And the thing

14   that they fail to address, and he said it again is, oh,

15   well, there will be a Teva, and they'll just be able to

16   figure out what Teva got.

17             It is undisputed that if the Court does not

18   enter an injunction that Perrigo will go to market in

19   165 days, and there's no way to stop that.  But the entry of

20   the injunction under 5b under Galderma's interpretation and

21   Galderma's enforcement of that provision will ensure that

22   Perrigo does not go to market and that it goes back to the

23   way it was until the Federal Circuit can look at these

24   issues.

25             This is a major part of Galderma's

1    pharmaceutical business.  It accounts for 31 percent of

2    Galderma's pharmaceutical business.  It has three products.

3    It's a big company, and it does a lot of other things.

4              THE COURT:  Yeah, but I was going to say, yeah,

5    because I saw the figure of $90 million for the net revenues

6    of this and 900 million for the net revenues of Galderma.

7              MR. ALIBHAI:  I don't think it's fair to look

8    at -- a couple of things.  I don't think it's fair to look

9    at worldwide business of Galderma which includes selling

10   Cetaphil such as a soap or which includes selling

11   injectables.  But if we're looking at the prescription

12   drug --

13             THE COURT:  But you are one company, so you

14   know, breaking it down into little pieces and saying, well,

15   this little piece is a big part of, you know --

16             MR. ALIBHAI:  Well --

17             THE COURT:  -- I'm not too sympathetic to that.

18             MR. ALIBHAI:  Well, what I think the Court

19   should be sympathetic to is looking at Soolantra by itself.

20   The Soolantra market will be decimated as it comes to

21   Galderma, and there will be actual layoffs.  There will be

22   people losing their jobs.  There will be an effect on this

23   business segment.  That's not really disputed.

24             And because of that harm, actual tangible harm,

25   they just keep saying that we'll be able to quantify it down

1   the road.  I don't think they'll say that a year from now.

2   You'll hear the exact opposite.

3               THE COURT:  No.  No.

4               MR. ALIBHAI:  And that's why --

5               THE COURT:  So I have a case that I got from

6   Judge Robinson where she had granted preliminary injunction

7   which the Federal Circuit later vacated and said plaintiff

8   had no case, and the plaintiff had to put up millions and

9   millions of dollars as a bond.  So I've seen all these

10  issues before from in reverse because I had to figure out,

11  because if it turns out, having done this, when you put up a

12  bond and then it turns out you prevented the defendant from

13  entering in the market, they have damages, and so you have

14  to figure this stuff out.  And I found out that you don't

15  have a jury do this.  The judge has to do this.

16              MR. ALIBHAI:  That's correct.

17              THE COURT:  So the concepts, a lot of these

18  concepts, I've seen them before.  You know, in the end, we

19  were able to issue an opinion saying what we thought the

20  damages in that particular case was.

21              You know, and maybe one of the things that's

22  kind of different here now is it's different when you're

23  looking back at what happened, and you're trying to figure

24  out, okay, what's supposed to make it right.

25              Here, you know, there's a lot of predictions.

1     And so to get to your point, you know, Mr. Fleming, will be

2     arguing the opposite in two years, one of the most

3     frustrating things about the case that I had a year ago to

4     do this was the parties' positions were diametrically

5     opposed to what they had been at the preliminary injunction

6     stage where the plaintiff said, you know, it will be the end

7     of the world if the preliminary injunction is not granted.

8              And by the time when we were trying to decide

9     how much damage they had done, they said, nothing happened.

10    We did it in a hurry.  We didn't have a chance to think

11    about this, and we were all wrong.  And now we've spent more

12    time and nothing happened.  And of course, the defendants

13    were also, likewise, reversed.

14              So I expect that if it suits everybody, you can

15    take diametrically-opposed positions sometime in the future.

16    That's just what we all --

17              MR. FLEMING:  Hopefully, I was more persuasive

18    today.

19              MR. ALIBHAI:  Well, Your Honor, what I'm looking

20    at is a body of law that we've cited, both from the Federal

21    Circuit and from courts in this district.  Right.  Opinions

22    from Judge Sleet and Judge Robinson that address this issue

23    and this type of situation, and say, Look, the Federal

24    Circuit has often said -- and you know, there was a quote

25    from Judge Robinson in Cyclobenzaprine.  She said, "In every

1    ANDA case, there's a likelihood of irreparable harm for the

2    brand because a generic has already made markets flood."

3    That's already happened.

4              And the price of Soolantra is dropping.  This is

5    not Galderma's doing.  This is Teva's doing.  Teva chose,

6    knowing that we did not want to have a generic in the

7    marketplace, that we were opposed, and that they we would

8    seek injunctive relief, if necessary, to go ahead and launch

9    without notice.

10             THE COURT:  So Mr. Alibhai, I'll tell you what,

11   why don't you let me just take a little recess here, and

12   I'll come back in a little while and tell you whether or not

13   I'm going to issue any ruling today.

14             Okay?

15             MR. ALIBHAI:  Yes, sir.

16             THE CLERK:  All rise.

17             THE COURT:  So we'll be in recess.

18             (Recess was taken.)

19             THE CLERK:  All rise.

20             THE COURT:  All right.  Be seated.

21             So let me try to address the issue that we're

22   here to address, and I do believe that the applicable rule

23   here is Rule 62(d) which says and I quote, "While an appeal

24   is pending from a final judgment that refuses an injunction,

25   the Court may grant an injunction on terms for bond or other

1   terms that secure the opposing party's rights."

2            And I left out a lot of the intermediate words

3   that aren't particularly pertinent here, but obviously, in

4   the ANDA case when I find a patent invalid, I'm refusing to

5   grant an injunction against the defendant, so that's why

6   that applies.

7            And I have cases, and I'm quoting from one of

8   Judge Stark's cases from earlier this year which relies on

9   the U.S. Supreme Court which is pretty good authority for

10  what the standard is on to succeed on a motion for an

11  injunction pending appeal.

12           And I'm quoting here, "Plaintiff needs to show a

13  strong showing that it is likely to succeed on the merits in

14  this appeal, that absent an injunction will be irreparably

15  harmed, and that an injunction or stay will not

16  substantially injure the opposing party, and an injunction

17  will not harm the interests of the public."  And that's from

18  Cipla Limited versus Amgen, 2019 Westlaw 2053055, District

19  of Delaware, May 5 of 2019.

20           So on the question of the merits and the

21  likelihood of success on appeal, whether or not a

22  substantial issue is raised, I think plaintiffs have raised

23  a substantial issue with the opinion, and I think Mr. Wilson

24  fairly straightforwardly in his argument expressed what that

25  is.  I thought that the defense of my opinion by Teva was

1    not very strong which gives me some sense that the arguments

2    they're going to make on appeal are going to be different

3    than what I said, so I'm not real confident that I'm going

4    to get affirmed on this.  And I say that against the

5    backdrop that it does strike me, though I haven't thought

6    about it and I can't really think about it now, that it may

7    be at the end of the day that even though the patents are

8    not anticipated, they're obvious.

9            I mean, I do think the case -- I think it's

10   Perricone, in my opinion, is a bad case for plaintiff.  And

11   you know, I think taking a disclosed method and a disclosed

12   compound, and then claiming the method, the known method of

13   administering the compound and then saying, Well, here's the

14   results we got in the clinical trials, we'll add them in,

15   and now we've got a new patent, that strikes me as if

16   plaintiff can really do that, that's not very good for the

17   system.  But based on what I've written so far, I do think

18   plaintiff has a good argument or a decent argument that

19   maybe I got it wrong.

20           On the question of irreparable harm, much of

21   what I read in the briefs, or in the -- briefs is probably

22   the right word, but in the declarations of the economist, it

23   made me think that, generally speaking, a lot of damages or

24   harms, financial harms in this case, they could be measured

25   down the road, and they could be measured in similar fashion

1    to how they're generally measured in other patent cases.

2           But I also thought, which maybe it was in the

3    briefing, but I hadn't fully appreciated in the briefing, it

4    does seem, based on what I saw of the contract, that there's

5    at least a reasonable argument that if I grant the

6    injunction, Perrigo won't be able to enter the market until

7    after Teva, or until 2024, or thereabouts.  But that if I

8    deny the injunction, assuming the Federal Circuit doesn't

9    reverse that decision, they're going to be on the market

10   stay.

11          And if it turns out that I'm wrong on the

12   anticipation and it gets reversed, that seems to me to be a

13   harm that the loss that's created by Perrigo as a result of

14   what Teva has done is not something that anybody will pay

15   for.  Perrigo is certainly not going to be liable, but I

16   don't think Teva would be liable for the harm Perrigo

17   causes, and yet that would be a real harm that flows

18   directly from not granting the injunction.  So I think,

19   though I was initially dubious about there being irreparable

20   harm here, I think actually there's a decent likelihood

21   there would be irreparable harm.

22          On the other things, I'm unclear, as I sit here

23   right now, as to how much harm there will be to Teva.  I'm

24   going to impose a bond so just the delay in launching, that

25   harm will be covered.  I'm unclear on whether or not the

1    180-day exclusivity will be forfeited or not.  If it is,

2    that is a substantial harm to Teva.  And for purposes of

3    this, I'll assume that that's the case.

4              In terms of how the injunction would affect the

5    interests of the public, you know, that seems to be kind of

6    balanced because, on the one hand, plaintiff has its patent

7    rights.  You know, there's a lot of investment in new drugs,

8    so I don't think this is particularly a new drug investment.

9              You know, on the other hand, the public's going

10   to not get the benefit of the generic pricing which is a

11   large part of why we have these cases.  And so I think

12   there's something on both sides there.  But on balance,

13   weighing all those things together and exercising my

14   discretion, and I certainly don't like to exercise my

15   discretion this way, but I am going to grant the injunction

16   pending appeal, and basically there is a question of what

17   the bond should be.

18             Is that something that either of you care to say

19   anything to me about?  Start with you, Ms. Ben-Ami or

20   Mr. Fleming.

21             MS. BEN-AMI:  Well, I'll give it a shot, Your

22   Honor.  I think, first of all, we'd like to make a motion to

23   stay your ruling pending the appeal of your ruling.

24             THE COURT:  No, you can -- well, actually I will

25   stay it for three days.  Or wait, what is today?  Today's

1  Thursday.  I'll stay it until Tuesday of next week, and then

2  you can go to the Federal Circuit and see if they want to

3  stay it.

4         Okay?

5         MS. BEN-AMI:  Okay.  I know you don't want to

6  hear my bases, so since you granted it, I won't waste your

7  time.

8         I think that the FDA has stated that the 180-day

9  exclusivity period runs from the first day that there's a

10  launch, and that is gone based on your ruling.  That's gone.

11         THE COURT:  All right.

12         MS. BEN-AMI:  And the implications of that are

13  Perrigo comes on the market because you didn't see Perrigo

14  coming in here and saying, oh, yeah, we agree.  You didn't

15  see a declaration.

16         THE COURT:  Okay.  Yeah.  Okay.  Let's just get

17  to the point here.

18         The bond, how much?

19         MS. BEN-AMI:  Right.  The bond should go for the

20  amount through 2023, and we'll have to come up with that

21  amount because there will be a loss assuming if we're right.

22         THE COURT:  And so you must have at least

23  thought about this number.

24         MS. BEN-AMI:  No.

25         THE COURT:  No.  Mr. Fleming, have you thought

1    about it?

2              MR. FLEMING:  No, Your Honor.

3              THE COURT:  Okay.

4              MR. FLEMING:  We're trying to.  I'm trying to

5    talk to the client while we're here, but --

6              THE COURT:  All right.  Have you all thought

7    about it, Mr. Alibhai?

8              MR. ALIBHAI:  I did, Your Honor.  So as I said

9    to Your Honor, it's my view that the issuance of the

10   injunction will mean that the clock will reset.  Perrigo

11   will not come in the market.

12             THE COURT:  Right.  But let's assume, because I

13   just said I'm going to assume that they will actually lose

14   their exclusivity, so factor that in.

15             MR. ALIBHAI:  If I were to factor in that

16   they're going to lose their exclusivity, which obviously we

17   disagree about that, then it should be looking at what they

18   would have made in a market in which there was Galderma, and

19   an authorized generic, and them --

20             THE COURT:  All right.

21             MR. ALIBHAI:  -- for six months.

22             THE COURT:  So tell me what you think that is.

23             MR. ALIBHAI:  So we know that the marketplace is

24   approximately today around $90 million.

25             THE COURT:  So, but you know, I don't think

1  that -- the six months is not right because the appellate

2  process is going to play out probably over 14 to 16 months,

3  and they are going to be off the market, assuming that I

4  don't get reversed on this, for that entire time; right?

5          MR. ALIBHAI:  They would be off the market if

6  you're not reversed during the time that the appeal is

7  pending.

8          THE COURT:  Yeah.

9          MR. ALIBHAI:  We could expedite the appeal.

10          THE COURT:  Well, you know, as the Federal

11  Circuit likes to say, you can self expedite.  I don't know

12  that they'll -- and in fact, so far you have done the

13  opposite of self expediting.

14          MR. ALIBHAI:  I wasn't aware they were going to

15  launch, but I understand, and I'm willing to expedite.  But

16  you would look at this marketplace which is a

17  90-million-dollar revenue -- we're not talking -- and then

18  you'd have to take a segment of time of that, and then you'd

19  have to divide up how that marketplace would look as to what

20  Teva was making, what the authorized generic was making, and

21  what Galderma is making, because it's a portion of that.

22          THE COURT:  Well, do you agree that, generally

23  speaking, what Teva loses by not launching is some fraction

24  of that $90 million because they're probably not going to be

25  getting back all that many people to switch from some other

1    treatment to generic Soolantra.  They're going to be getting

2    branded Soolantra, for the most part, to move to generic

3    Soolantra; right?

4              MR. ALIBHAI:  Well, during this time period,

5    there's going to be some amount of product that they've put

6    in the marketplace and that they can continue to put in the

7    marketplace until Tuesday.  And what the evidence shows is

8    that can be up to six months' worth.  And so they have to

9    tell us how many units they've put out there because they're

10   going to make money during this next few months from its

11   continued sale.  So they're still getting some benefit for

12   months to go.

13             So it's a fraction of the revenues, and then

14   we'd have to look at profits on that because they don't get

15   net revenues, they get profits on it.  Right.  Just regular

16   patent infringement damages are profits not revenues.

17             THE COURT:  Right.  So give me a number.

18             MR. ALIBHAI:  Well, my number based on the time

19   value of money because I think they're going to make this

20   money in the future, but I think the number is in the low

21   single-digit millions based upon a $90 million market, and

22   then three players in the market place, if that's what would

23   be happening today, and then dividing that up.  And you have

24   Mr. Bart's declaration at paragraph 13 where he said people

25   were buying the authorized generic, not theirs.

```
 1                    THE COURT:  Yeah.  Yeah.  I mean, I think he
 2        said one person.  He didn't say -- that wasn't a study or
 3        anything.
 4                    MR. ALIBHAI:  I don't know what he said in terms
 5        of how many people it was, he just said that generally.  But
 6        again, it would be the profits that they're losing in
 7        today's marketplace as it exists which I think is a low
 8        millions number because they only hope to make 20 or
 9        $30 million in revenue at best from the numbers that I've
10        seen.
11                    THE COURT:  All right.  Mr. Fleming, do you have
12        something to add?
13                    MR. FLEMING:  Thank you, Your Honor.  We have
14        done some discussion.  I've done a quick calculation in my
15        head based on the numbers.  You're right, this is going to
16        be an 18-month process in a 90-million-plus-dollar market.
17        We would ask for a bond of $75 million.
18                    THE COURT:  Billion?
19                    MR. FLEMING:  Million.  I'm sorry, did I sound
20        like that?  I didn't mean to go like that.  I meant million.
21                    THE COURT:  Well, I don't know.  That's what I
22        heard, but I think you're wrong.  Well, that seems a bit
23        excessive --
24                    MR. FLEMING:  Well, Your Honor --
25                    THE COURT:  -- but go ahead.
```

1          MR. FLEMING:  May I?  Thank you.

2          So what I want you to understand is the 180 days

3    is going to be gone in six months, and that was a criterion

4    by which the decision to launch hinged.  So in the absence

5    of that, we run the real probability that the economics of

6    this to a generic because, Your Honor, I will make a side

7    wager with you about what happens with Perrigo in six

8    months.  But what I will tell you is because of the value

9    that that exclusivity gives to a first entrant, you know

10   what a first-market entrant does, to be a second and perhaps

11   now a third-market entrant with the AG, that is destroying

12   in value to Teva.  So that number is nowhere near as

13   exorbitant as it may sound on the merits given that.

14         THE COURT:  Well, so let me ask this, and I'll

15   give you a few more minutes to confer, if you want, but what

16   was Teva estimating its profits would be from the first

17   year?  I mean, I'm sure they study this thing, and they have

18   a total estimate.

19         What were they projecting?

20         MR. FLEMING:  Your Honor, I think roughly $25

21   million.

22         THE COURT:  Okay.  All right.

23         MR. FLEMING:  And that's net.  That's net.

24         THE COURT:  Yeah.  Yeah.  But I mean, presumably

25   that's what we're talking about here.

```
 1                    MR. FLEMING:  I would think so.  I would think
 2    so.  So now you've got an 18-month period, and you've got
 3    the loss of the market exclusivity as a multiplier.  You
 4    have to take that into account.
 5                    THE COURT:  All right.
 6                    MR. FLEMING:  It's at least a two times
 7    multiplier.  And Your Honor, what I would ask you to do is
 8    order them immediately to stop sales of the AG.
 9                    THE COURT:  Well, what do you think about that?
10                    MR. FLEMING:  They said they were going to do
11    that if you enjoined us, so let's hold them to what their
12    word is.
13                    MR. ALIBHAI:  If the Court issues an injunction,
14    prohibits Teva from further sale and recalling the generic
15    that's in the marketplace --
16                    THE COURT:  What if I don't recall the generic?
17                    MR. ALIBHAI:  If you don't recall the generic?
18                    THE COURT:  Because you were certainly talking a
19    minute ago like I wasn't going to.
20                    MR. ALIBHAI:  Well, I think you should because,
21    otherwise, they're asking you for a bond while they continue
22    to make profits.  That $25 million number you just heard
23    assumes six months exclusivity.
24                    So putting a multiplier on a number that's
25    already got the six months exclusivity, it makes no sense.
```

1    So the purpose of the bond is to create some protection.  If

2    we need to have hundreds on this, then we think the Court

3    should issue a small bond, so the thing can go -- so the

4    injunction can go into effect.  We can submit briefing and

5    evidence because they have numbers they've created, and

6    we've never seen those, and so we'd be able to look at that

7    and make a proper determination.

8            THE COURT:  So my recollection from having done

9    this before is the bond, as I said, acts as sort of a cap as

10   to what the damages down the road can be.  So there's --

11           MR. ALIBHAI:  That's correct.

12           THE COURT:  -- not much incentive to -- so from

13   my point of view, the incentive is to risk -- give them too

14   high a bond, not too low a bond.

15           MR. ALIBHAI:  I'm saying that we need to have

16   further discussion about this because they've not produced

17   documents or shown us how these sales forecasts work.  You

18   have a $90 million market that they would not have gotten

19   all of.  You take the profits of that, and you have to take

20   into consideration that their price is lower than what

21   Galderma was selling at.

22           They haven't told us what price they're selling

23   at.  I don't know what price they're selling at, so you have

24   to factor in all these issues.  The amount of profit that

25   they would have made is nowhere near $25 million, in my

1    opinion, in the first year.  It's impossible to say a

2    90-million revenue would have turned into 25 million of

3    profit for Teva with price erosion with an authorized

4    generic.

5           But to answer the question that you asked me, we

6    will instruct the authorized generic not to or to stop the

7    authorized generic.

8           THE COURT:  Mr. Fleming, what do you have to say

9    about recalling the six months of product that you had out

10   there?

11          MR. FLEMING:  Well, Your Honor, I think that's a

12   gross overstatement.  My information was it's more like two

13   months.

14          THE COURT:  So what about recalling the two

15   months?

16          MR. FLEMING:  Well, Your Honor, the problem with

17   that is we have contracts now for distribution and sale of

18   this product, so we're going to have to go to our customers

19   and pull the product back.  It's just grossly unfair to do

20   that.  We should be able to at least sell off the product we

21   have based on the contracts that we've made with these

22   clients in good faith.  They bought it from us in good

23   faith, and we should be able to deliver on those contracts.

24          Excuse me.  I will tell you that the $25 million

25   number that I gave you was a forecast based on all of these

1    variables.  Galderma is a big company.  They know how these

2    numbers are calculated.  To profess ignorance of it is

3    almost an insult to the Court.  We know, and I'll tell you

4    that that $25 million number was a 12-month projection.

5              THE COURT:  I don't take it to as an insult to

6    the Court.  They don't say how generally one does this kind

7    of thing.  They said they don't know how specifically you

8    did it, and they don't.  Right?

9              MR. FLEMING:  It's the information that these

10   companies is out there, but, yes, they know what their

11   generic is selling at.  They priced it against our products,

12   Your Honor.  They know how -- any way, Your Honor, what I

13   would say to you is let me answer your question, let us sell

14   out based on our contracts.  Let us meet our contracts that

15   are currently in place.

16              And also, I will tell you that the number that I

17   gave you took into account the variables that Mr. Alibhai

18   said that he didn't understand.  I hope I answered your

19   question.

20              THE COURT:  Maybe.

21              MR. FLEMING:  I'll stop because often times I

22   speak so much, you forget what your question was.

23              THE COURT:  Okay.  Mr. Alibhai.

24              MR. ALIBHAI:  Well, that goes to the amount of

25   the bond, too.  If they're going to sell for two more

1    months, and if Your Honor is going to stay the injunction

2    until Tuesday, that doesn't stop them from entering into new

3    contracts and then fulfilling them.

4         THE COURT:  Okay.  Well, there are no new

5    contracts.  You know, the only thing that I'm staying until

6    Tuesday or the only thing -- let me think about this real

7    quick.

8         So actually on balance, it occurs to me that I

9    don't know that much about this industry because after all,

10   Mr. Fleming, when you say you have contracts, there are

11   contracts where you've already delivered the good, and

12   there's contracts that provide you to be -- because I think

13   I saw in the briefing Walmart, and maybe that was the

14   authorized generic.  I can't remember, but I saw --

15        MR. FLEMING:  We have agreements with,

16   contracts, purchase orders, however you want to describe it

17   where we have made commitments to clients, to customers to

18   deliver product to them.

19        MR. ALIBHAI:  And our belief, Your Honor, is

20   they should not be able to make those deliveries.

21        THE COURT:  Okay.  So based on what I've said

22   about, among other things, irreparable harm, and also to

23   some extent what I think are or what seem to me as likely to

24   be -- maintaining the status quo, I don't think Teva should

25   ship any more product.  I'm not going to make you recall

1   product that you've already put on a truck to somewhere

2   else.  And it just seems to me based on what I've said, and

3   I guess maybe to the extent that Ms. Ben-Ami earlier said

4   can it be stayed until next Tuesday or some short period of

5   time, you know, maybe I thought about that too quickly.

6          So based on everything that I've heard and

7   taking into account that I think that Teva's six-month

8   exclusivity may be lost, I'm going to enter an injunction

9   orally today, in writing tomorrow, no more shipment by Teva.

10  No recall of the product by Teva.  The authorized generic is

11  cancelled.

12          And in fact, do you know -- so I take it you

13  shipped some authorized generic, too?

14          MR. ALIBHAI:  That's correct.

15          THE COURT:  And do you want it out there, or do

16  you want to recall it?

17          MR. ALIBHAI:  If you're going to leave the other

18  product out there, we believe you should leave that product

19  out there as well.

20          THE COURT:  All right.  How much have you

21  shipped?

22          MR. ALIBHAI:  I think it's a few weeks of

23  supply.

24          THE COURT:  All right.  And you're representing

25  you've shipped two months of supply?

1          MR. FLEMING:  I've heard that number, Your

2    Honor, but I know I've been told it's not six months.  But

3    whatever -- right, whatever is out of Teva is out of Teva.

4          THE COURT:  All right.  Whatever is out of

5    plaintiff is out of plaintiff, but nobody is shipping any

6    more product.  And my inclination is to require Galderma to

7    post a bond of $40 million which is based on the

8    representations about what Teva's expected profits are and

9    based on the possibility that I think is real that they're

10   going to lose their exclusivity.

11         And I want to make sure that there is enough

12   money to cover the harm to Teva that if it turns out that

13   the silver tongue warriors for the plaintiff have caused me

14   to do something I shouldn't be doing here.

15         Is there anything else we need to address today?

16         MR. FLEMING:  No, Your Honor.

17         MR. ALIBHAI:  No, Your Honor.

18         MR. WILSON:  Would Your Honor like us to submit

19   a proposed order or you're going to draft one?

20         THE COURT:  Well, there was with the motion of

21   proposed order.  I would certainly not be adverse to your

22   modifying it and talking to each other before you modify it

23   to incorporate what I've said here today, and then hopefully

24   submitting it jointly.  But if you disagree, then submitting

25   it also with a Word version that we can edit.

1          MR. WILSON:  And I did have one question which

2     is the three-day stay, you decided against?

3          THE COURT:  I've decided against that.

4          MR. WILSON:  Okay.

5          THE COURT:  Okay.  And I'm sorry to do this, do

6     you think you can talk to each other and submit hopefully a

7     joint proposal tomorrow at some point or at least submit

8     competing proposals?  I mean, I didn't look at it real

9     closely because I didn't really think I was going to be

10    granting this.  You know, I saw that there was a three-page

11    submission.

12         MS. BEN-AMI:  Can we have until Monday?

13         THE COURT:  Well, as long as you're not shipping

14    any product until Monday.

15         MS. BEN-AMI:  I think you've enjoined it.

16         MR. ALIBHAI:  If the oral order is by Monday

17    binding, and they accept that it's binding.

18         THE COURT:  Well, Ms. Ben-Ami just indicated she

19    did.

20         MR. ALIBHAI:  So then we're not opposed to that.

21         THE COURT:  And then we've got representatives

22    of both Teva and Galderma here, and I assume the

23    representatives are basically lawyers, too.  So no more

24    shipping of product, $40 million bond, but no recall.  And

25    let's get some language for injunction, and then you can go

1   visit the Federal Circuit and see how many different times

2   you can get me reversed.

3                    Okay?  Thank you.

4                    MR. ALIBHAI:  Thank you, Your Honor.

5                    THE CLERK:  All rise.

6                    (Court was recessed at 6:02 p.m.)

7                    I hereby certify the foregoing is a true and

8   accurate transcript from my stenographic notes in the

9   proceeding.            /s/ Heather M. Triozzi
                            Official Merit Reporter
10                          U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25